WESTBROCK et al., Appellees,

v.

WESTERN OHIO HEALTH CARE CORPORATION, Appellant.

[Cite as *Westbrock v. W. Ohio Health Care Corp.* (2000), 137 Ohio App.3d 304.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 17417.

Decided March 17, 2000.

306

*Faruki, Gilliam & Ireland, Paul G. Hallinan* and *Thomas R. Kraemer,* for appellees.

*Bieser, Greer & Landis, David C. Greer* and *John F. Haviland;* and *McDonald, Hopkins, Burke & Haber, R. Jeffrey Pollock* and *William J. O'Neill,* for appellant.

WALSH, Judge.

Defendant-appellant, Western Ohio Health Care Corporation ("Western Ohio"), appeals a judgment entry of the Montgomery County Court of Common Pleas, awarding plaintiffs-appellees, David A. Westbrock, M.D., et al.[1] ("the physicians"), $12,482,461. We affirm the judgment of the trial court.

The Western Ohio Foundation for Medical Care (the "Foundation") was formed in 1973 to promote the distribution of health care services provided by private physicians in the greater Dayton area. The Foundation members consisted of physicians, who elected trustees to operate the Foundation. In 1979, the Foundation established the Western Ohio Health Care Plan (the "Plan"), a Health Maintenance Organization ("HMO"). This was an independent practice association HMO, in which individual private practice physicians would contract with the HMO to provide medical services to subscriber-patients and fees would be charged in accordance with a schedule of fees. By forming their own HMO, the Foundation members hoped to compete with other HMOs, while retaining significant control over the private practice of medicine.

The Foundation fully operated the Plan until it transferred the Plan's assets and liabilities to its wholly owned for-profit subsidiary corporation, Western Ohio, in 1984. At the end of 1987, the Foundation exchanged all of its common stock for preferred stock and cash and sold common stock to physician-providers and other eligible buyers for $1 per share. The new shareholders assumed control of Western Ohio in 1988 and operated the Plan until 1993, when they sold all shares to United Health Care Corporation ("United") for a purchase price of $100,300,-000. A distribution of $3,000,000 was paid out to the physician-providers who were working with Western Ohio at that time.

The physicians served as physician-providers for Western Ohio at various times between 1979 and the date of this lawsuit. All physician-providers who participated in the Plan in the years of 1979 through 1983 signed a contract (the "1979 contract"), and in 1984, the 1979 contract expired and was replaced with a new contract (the "1984 contract"), which was also signed by all physician-providers. Under the terms of these contracts, the physician-providers agreed to allow Western Ohio to withhold a percentage of their fees to fund a physicians' contingency reserve ("the reserve").

Western Ohio did not return approximately $2,500,000 of the reserve withheld during the years of 1979–1982 and approximately $6,000,000 of the reserve

---

1. The plaintiffs-appellees are David A. Westbrock, M.D., on behalf of himself and all others similarly situated, Clifford Gehart, M.D., John J. Peterangelo, D.O., James L. Cromwell, M.D., and John J. Boyles, Jr., M.D.

withheld during the years of 1985–1987. In other years, the reserve was returned. Beginning in 1983, physician-providers who terminated their participation during a particular year did not have their share of the reserve returned to them.

The physicians sued Western Ohio for breach of contract, demanding the return of the reserve, which amounted to $8,500,000, plus prejudgment interest. The physicians' complaint alleged other claims in addition to breach of contract, but those issues were resolved between the parties. The trial court conducted a bench trial on the breach of contract claim.

The bench trial was held on May 22, 1996 through May 30, 1996. The trial court issued its preliminary findings of fact and conclusions of law on March 13, 1998. On July 6, 1998, the trial court filed a decision and order addressing the claims regarding terminated physician-providers and prejudgment interest, as well as modifying some of the preliminary findings of fact and conclusions of law. On September 9, 1998, the trial court filed a judgment entry that corrected some clerical errors made in the March 13, 1998 entry.

The trial court found that both the 1979 and 1984 contracts had been breached by failure to return the reserve to the physician-providers. The trial court determined that Western Ohio was obligated to return the reserve funds that had remained undistributed once Western Ohio had achieved financial stability sufficient to allow it to do so. The trial court further found that a provision in the 1984 contract that purported to allow Western Ohio to cancel the reserve account of a physician-provider who is terminated without cause was an unenforceable forfeiture provision; therefore, the amount of the reserve to be returned was not to be reduced by the reserve accounts of terminated physicians. Finally, the trial court awarded the physicians prejudgment interest from October 1, 1992, the date that the trial court determined Western Ohio had been sufficiently financially secure to distribute the amounts held in the reserve.

In a September 9, 1998 judgment entry, the trial court calculated the amount of the judgment award to be $12,482,461. This figure included a principal of $8,081,054 and $4,401,407 in prejudgment interest. Western Ohio appeals, raising four assignments of error.

Assignment of Error No. 1:

"The trial court committed reversible error in 'interpreting' the two relevant contracts to conclude that the physicians had a right to require payment to them of PCR [Physicians' Contingency Reserve] used in the past to cover plan expenses."

In its first assignment of error, Western Ohio argues that pursuant to the 1979 and 1984 contracts, the physicians have no legal entitlement to reserve funds

previously spent for Plan purposes. Western Ohio contends that the trial court's finding that the reserve funds collected were "loans" owed to the physicians was unsupported by the terms of the contract.

The construction of written contracts is a matter of law. *Long Beach Assn., Inc. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208, 209–210, citing *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 448–449, 474 N.E.2d 271, 272–273. Questions of law require *de novo* review by this court. *Long Beach* at 576, 697 N.E.2d at 209–210, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286, 287.

"The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519, 526. Where a written instrument is unambiguous, a court must give effect to the expressed intentions of the parties. *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 55, 716 N.E.2d 1201, 1207–1208, citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 922–923. Contractual language is "ambiguous" where its meaning cannot be derived from the four corners of the contract or where the language may be reasonably interpreted in more than one way. *United States Fid.* at 55, 716 N.E.2d at 1207–1208, citing *Potti v. Duramed Pharmaceuticals, Inc.* (C.A.6, 1991), 938 F.2d 641, 647. "A contract is ambiguous if the rights and duties it imposes on the parties to it are reasonably subject to conflicting interpretations." *Matthews v. Morris Sons Co.* (1997), 118 Ohio App.3d 345, 349, 692 N.E.2d 1055, 1058.

Western Ohio argues that the trial court improperly considered extrinsic evidence when interpreting the terms of the contracts. However, a review of the trial court's judgment entries reveals that the trial court did not rely on extrinsic evidence for its contract interpretation; rather, the trial court found that the 1979 and the 1984 contracts were unambiguous and interpreted these contracts on their faces. The determination of whether a contract is ambiguous is a question of law. *Potti v. Duramed Pharmaceuticals, Inc.* (C.A.6, 1991), 938 F.2d 641, 647, citing *D.L. Baker & Co. v. Acosta* (N.D.Ohio 1989), 720 F.Supp. 615, 618. Therefore, the trial court's determination that the contracts were not ambiguous is subject to *de novo* review. See *Potti* at 647.

The 1979 contract gave a committee authority to withhold a portion of each physician-provider's fees to fund a reserve. Specifically, paragraph eleven of the 1979 contract states the following:

"The Physician hereby agrees that the Committee shall have the right to reduce by whatever amount it deems appropriate any fees payable to him for services rendered pursuant to the Plan if the Committee should determine at any time that it is absolutely necessary in order to preserve the financial integrity of the Plan to establish a reserve to cover financial risks associated with the Plan. The Foundation shall provide the Physician with all of the financial information on which such information on which such reduction is based with the notice which it sends to the Physicians of the reduction. The Physician's pro rata share of such reserve whether established pursuant to this Section 11 or by contributions made by the Physician to such reserve beyond the obligations under this Section 11 shall be distributable to the Physician not later than the 90th day of the second year after the year in which such contribution or fee reduction is made by or for the Physician. If the Physician's participation in the Plan terminates for any reason prior to the date when such distribution is permitted, the Physician shall not receive any part of such distribution until the date indicated above.

"As an illustration of the distribution procedure described above, assume that the physician has contributed or has deposited by virtue of fee reductions in the reserve an amount equal to 10% of the reserve fund total for his first full year of participation in the Plan. Further assume that the Physician's first full year of participation in the Plan terminates on December 31, 1979 and that on January, 1, 1981 the balance remaining of the total risk reserve fund for the year ending December 31, 1979 is $20,000. Not later than March 31, 1981 the Physician shall be entitled to the distribution of $2,000 from the risk reserve fund for the year ending December 31, 1979 since his 10% share of that fund equals $2,000 as of the beginning of the second year after that initial year of participation. This distribution would not be required before March 31, 1981 even though the Physician's participation in the Plan may have terminated prior to December 31, 1979. The risk reserve fund balance for each year shall be segregated from the fund balance for every other year."

Paragraph twelve of the 1979 contract states:

"The Foundation shall provide the Physician with a copy of its annual financial statements for every year during which the Physician is a member of the Plan or has any funds credited to his name in the above-described risk reserve fund."

The trial court found that the 1979 contract was unambiguous and determined that the Foundation was obligated to return the reserve funds to the physicians. This contract permits withholding a portion of each physician-provider's fees when "absolutely necessary in order to preserve the financial integrity of the Plan." The clear language of the contract states that "[t]he Physician's pro rata share of such reserve * * * *shall be distributable to the Physician* not later than the 90th day of the second year after the year in which such contribution or fee

reduction is made by or for the Physician." (Emphasis added.) The contract, in an illustration of the distribution procedure, continues to state that *"[n]ot later than March 31, 1981 the Physician shall be entitled to the distribution* of $2,000 from the risk reserve fund for the year ending December 31, 1979 since his 10% share of that fund equals $2,000 as of the beginning of the second year after that initial year of participation." (Emphasis added.) There is no provision in the contract granting power to permanently withhold the reserve funds.

The Foundation may have been justified in failing to return the reserve funds when returning such funds was not financially possible. However, the fact that the Foundation might not have been financially capable of returning the reserves to the physician-providers during certain years does not change the fact that it was obligated to return these funds once it could do so without jeopardizing the Plan's financial security. Therefore, we agree with the trial court's determination that the clear language of the 1979 contract shows that the parties intended that the reserves be returned to the physicians when this could be done without harming the financial integrity of the Plan.

In 1984, all of the physician-providers signed a new contract, which replaced the 1979 contract. Paragraph six of the 1984 contract states the following:

"The Physician hereby authorizes the Corporation to withhold, during each of the Corporation's fiscal years, from the fees payable to him under Paragraph 5, [establishing fees] such amounts, which when combined with amounts withheld from all other participating Physicians, are deemed necessary by the Corporation's Board of Directors to (1) fund any projected deficits for the fiscal year as set forth in the annual budget approved by the Board of Directors of the Corporation, (2) affect provider utilization patterns in a manner consistent with the Corporation's best interests, or (3) establish or maintain the financial stability of the Corporation. (Such withheld fees are hereinafter referred to as 'Reserves.') Any change in the Reserve rate will be communicated to the Physicians prior to such change together with financial information necessary to justify such change."

Paragraph seven of the 1984 contract states the following:

"The Physician shall not have any vested interest in the Reserves unless and until the Corporation shall, from time to time, in the sole discretion of its Board of Directors of the Corporation determine that a portion or all of the Reserve shall be distributed to him. The Physician acknowledges that the Board of Directors of the Corporation may distribute the Reserve to him or to other participating Physicians on a discriminatory basis based upon the comparative cost effectiveness of each participating Physician either as a reward for the

providing of efficient services or as an incentive to continue to provide quality care in a cost effective manner."

Under the terms of the 1984 contract, Western Ohio was authorized, in paragraph six, to withhold physician fees if the board of directors found this necessary to (1) fund projected deficits, (2) affect provider utilization patterns, or (3) maintain Western Ohio's financial stability. Western Ohio argues that although it was bound by these parameters when deciding whether to withhold a portion of the physician fees in the first place, it had "sole discretion," as expressed in paragraph seven, in choosing whether or not to return any of the withheld reserve funds to the physician-providers.

After reviewing the 1984 contract on its face, the trial court concluded that the clear and unambiguous terms of the contract provided that the reserve must be returned to the physicians. However, we disagree with the trial court's finding that this contract language is unambiguous.

The wording in paragraph seven is confusing. Paragraph seven states that "[t]he Physician shall not have any vested interest in the Reserves unless and until the Corporation shall, from time to time, in the sole discretion of its Board of Directors * * * determine that a portion or all of the Reserve shall be distributed to him." This sentence is susceptible of different interpretations. The phrase *"unless* and *until* the Corporation *shall* * * * determine"* (emphasis added) combines conditional and mandatory words, making it unclear whether the board of directors is obligated to return the reserves to the physician-providers or enjoys unbridled discretion in the matter. Although this paragraph states what must happen before the physician-providers have a "vested interest" in the reserve, it does not explain what happens to the physician-providers' interest if the board of directors decides not to distribute reserve funds at a particular point in time. The interest in such funds certainly seems to remain unvested, but the contract language does not explicitly state that this interest is extinguished. Moreover, paragraph seven, which provides that a physician-provider may receive less than all of his or her reserve funds, states that reserve funds may be returned in a discriminatory manner if doing so will reward efficient service or cost-effectiveness. However, it is not clear whether this is an exclusive list of reasons that would justify an incomplete return of a physician-provider's reserve account. Furthermore, it is not apparent whether the "sole discretion" granted to the board of directors in paragraph seven to determine whether reserve funds should be returned is limited by the three reasons for withholding physicians' fees provided in paragraph six. For these reasons, we conclude that the 1984 contract language is ambiguous.

When an ambiguity exists in a contract, it is appropriate for a court to consider extrinsic evidence. *United States Fid.,* 129 Ohio App.3d at 55–56, 716

N.E.2d at 1207–1209, citing *Blosser v. Carter* (1990), 67 Ohio App.3d 215, 219, 586 N.E.2d 253, 255–256. Such extrinsic evidence may include (1) the surrounding circumstances of the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) acts by the parties that evidence the construction they gave to the agreement. *Id.* A court may not use extrinsic evidence to create an ambiguity, however; instead, the ambiguity must be present on the face of the contract. *United States Fid.* at 56, 716 N.E.2d at 1208–1209, citing *Schachner v. Blue Cross & Blue Shield of Ohio* (C.A.6, 1996), 77 F.3d 889, 893. Generally, as a rule of contract construction, " 'if there is doubt or ambiguity in the language of a contract, the document is to be construed strictly against the party who prepared it or selected its language, and in favor of the party who took no part in its preparation or in the selection of its language.' " *Zimmerman v. Eagle Mtge. Corp.* (1996), 110 Ohio App.3d 762, 777–778, 675 N.E.2d 480, 489, quoting *Brads v. First Baptist Church* (1993), 89 Ohio App.3d 328, 341, 624 N.E.2d 737, 746–747; *McKay Machine Co. v. Rodman* (1967), 11 Ohio St.2d 77, 80, 40 O.O.2d 87, 89, 228 N.E.2d 304, citing *Smith v. Eliza Jennings Home* (1964), 176 Ohio St. 351, 27 O.O.2d 305, 199 N.E.2d 733.

In this case, the balance of the reserve account for each physician-provider has been maintained in Western Ohio's financial records. Each physician-provider's reserve account contains a tabulation of the amount of the physician fees taken by Western Ohio and put into reserve for each year. Western Ohio demonstrated that these reserve accounts have value by allowing physician-providers to purchase stock in Western Ohio with funds from their reserve accounts during the 1987 restructuring.

Moreover, Western Ohio published documents for the public and the physician-providers that termed the return of the reserves as a "liability" or "obligation." Western Ohio issued a Prospectus in August 1987 for the benefit of prospective stock purchasers. The Prospectus stated, in reference to the reserve, that "[g]iven the financial condition of the Company, and particularly its significant negative statutory net worth, it is unlikely that the Company will return the balance of the December 31, 1985, Reserve ($1,250,000) or the December 31, 1986, Reserve ($4,100,00) to the physician providers * * *. The Company is, however, committed to the policy of returning Reserves to the physician providers." Also in the Prospectus, Note F of the "Notes to Financial Statements" contains the following language regarding the reserve:

"During fiscal year 1987, the Board of Directors did not permit the return to physicians of any fees withheld. Therefore, the $9,928,000 liability for physicians' fees withheld at May 31, 1987, reflected approximately $6,345,000 fees withheld during fiscal 1987 in addition to the $3,583,000 liability existing at May 31, 1986.

*Return of all or part of the $9,928,000 liability as of May 31, 1987 is contingent upon sufficient profitability of future operations. This liability is classified on the balance sheet as non-current since it is not anticipated that it will be liquidated within the current operating cycle.* The May 31, 1986 balance sheet has been restated to conform with the 1987 presentation.

*"Physicians' fees withheld totaling $1,530,000 for the three months ended August 31, 1987 have been classified as a current liability* under the expectation that profitable fiscal 1988 operations will result in the return of such fees withheld." (Emphasis added.)

Nearly identical language was repeated in financial statements dated December 31, 1987, in which there are several references to reserve funds as a "liability." Also, a pamphlet distributed by Western Ohio entitled "Here are the Facts About Your Contingency Reserve" stated that "[o]ur Board feels a definite obligation to return any and all reserve depending on the performance of the health care plan."

John Monnett, Western Ohio's Chief Financial Officer, testified that the reserve was "a liability for general [*sic*] acceptable accounting purposes and as far as—and the fact that it was still owed." Dr. Jon Rahman, who at various times held the offices of Foundation Trustee, President of the Foundation, CEO, and Chairman of the Board at Western Ohio, testified about the 1984 contract that "we were committed to return reserves given our abilities to do so while maintaining the best interest of the financial stability of the plan." Joy Pascoe, a certified public accountant and Western Ohio's Vice President of Contract Management and Financial Analysis, testified that she had previously classified the reserve as a "non-current liability" in a position paper dated October 8, 1992. Moreover, in negotiations with United, Western Ohio indicated that the reserve balance, which at that time was approximately $6,000,000, was a liability which United would assume when it merged with Western Ohio.

The physicians' expert witness, Pat Gleitsmann, CPA, reviewed numerous Western Ohio financial documents referencing the reserve. She testified that the reserve was always recorded as a current or non-current liability. Gleitsmann explained that in this case, the reserve was treated each year as "accrued liability, which was actually in the balance sheet and had been run through the income statement." Gleitsman said that the nature of this disclosure indicates that "management believed it was a probable liability." Gleitsman stated, "If you decide it's reasonably probable or possible that you ever pay it, you need only to disclose it. If it's remote, you don't need to do either, and in this case, in every year, it was shown as an accrued liability and disclosed."

In contradiction to the above, some evidence tended to show that Western Ohio might not have intended to legally obligate itself to return the reserve to the

physician-providers under the 1984 contract, despite a good-faith commitment to returning it. Western Ohio argues in its brief that although the reserve may have been treated as a liability for accounting purposes, it was a contingent liability, which means that it was not certain. In support of this claim, Western Ohio cites portions of the 1987 Prospectus and financial statements that suggest that the decision whether to return the reserve, if ever, was a decision for the board of directors to make.

The balance of the extrinsic evidence, however, supports the assertion that the reserve was generally regarded as money owed to the physician-providers, even though Western Ohio was uncertain as to when it would be returned. Moreover, the ambiguity in the language of this contract should be construed strictly against the party who prepared it or selected its language, which in this case is Western Ohio. See *Zimmerman*, 110 Ohio App.3d at 777–778, 675 N.E.2d at 489–490. Furthermore, we note that there is no provision in· the 1984 contract that authorizes Western Ohio to extinguish the physician-providers' interest in the reserve. Therefore, we interpret the 1984 contract to require the return of reserve to the physician-providers once Western Ohio became financially secure.

█ Having found that under both contracts Western Ohio was obligated to return reserve funds to the physicians when it was financially able to do so, we must determine when, if ever, Western Ohio attained such financial stability. After a bench trial, the trial court determined that Western Ohio had been sufficiently financially secure to return the reserve as of October 1, 1992. Where the decision in a case turns upon the credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusion of the trial court, a reviewing court must defer to such findings and conclusions. *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614–615, 614 N.E.2d 742, 745–746, citing *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276.

█ The evidence shows that Western Ohio did not return reserve withheld in 1979, 1980, 1981, and most of 1982, a period when the Plan operated at a loss and used reserve funds to fund its operation deficit. The reserve withheld in 1983 and 1984 was returned to those physician-providers who remained active participants in the Plan. In 1985, the Plan suffered significant financial losses. Although the board of directors voted to return all of the reserves withheld in 1985, the Department of Insurance prohibited this distribution because of Western Ohio's poor financial condition. One-half of the 1985 withheld reserves was returned later in 1986. In 1986 and 1987, Western Ohio initiated new programs targeted to lower medical costs. The programs helped Western Ohio to generate profits in late 1987, and it continued to be profitable (except for a brief period in 1988), until its sale to United in 1993. The reserve funds from the years 1985

through 1987 were not fully returned and no reserve funds from the years 1988 through 1993 were returned.

Western Ohio's audited financial statements show that Western Ohio had a positive net income and accumulated retained earnings for the years 1989 through 1992. For the year ending on December 31, 1989, these statements show a net income of $183,505 and retained earnings of $1,833,879. These figures increased significantly throughout the next several years. For the year ending on December 31, 1992, the audited financial statements report a net income of $10,970,941 and retained earnings of $26,831,519. These figures demonstrate the increasing financial strength of Western Ohio. Gleitsman testified that it was her expert opinion, based upon her analysis of financial statements prepared and presented by Western Ohio's management, that Western Ohio was financially viable and sufficiently able to return the reserve in full in 1991 and could have paid portions of the reserve years before.

There was testimony at trial that substantial capital reserves are required to maintain an HMO and that it is difficult to predict future medical expenses. There was contradictory expert testimony about Western Ohio's need to retain the reserve funds after it continued to profit in 1990 and thereafter. However, the trial court determined that Western Ohio was sufficiently financially secure to have returned the reserve on October 1, 1992. Therefore, the trial court found that Western Ohio's failure to return the reserve funds on that date constituted a breach of contract. After subtracting reserve funds that had been used by the physicians to purchase stock in Western Ohio, the trial court found that Western Ohio owed the physicians $8,081,054 in unreturned reserves.

As discussed above, paragraph seven of the 1984 contract authorizes returning reserve funds in a discriminatory manner if doing so will reward efficient service or cost-effectiveness. Therefore, Western Ohio could have justifiably returned less than all of the reserve funds under this contract provision. However, there was almost no evidence presented to the trial court that suggested that this was Western Ohio's reason for failing to return the reserve fund to the physicians. The only evidence to this effect was the testimony of David Shafer, who held the positions of Director of Operations, Chief Operating Officer, and CEO of Western Ohio at various time between 1983 and 1992. Shafer stated that it was his opinion that the reserves withheld from 1985 through 1987 should not be returned because that would "reward" those physician-providers for the overall poor performance of the HMO during those years. This opinion was not supported by any other witness, and the trial court assigned no importance to this particular testimony in its findings of fact and conclusions of law. Moreover, this type of situation, where the reserve of all of the physician-providers would be withheld, does not appear to be addressed by paragraph seven; the contract

language seems to refer to the withholding of reserves based on a review of an individual physician-providers' performance, not a blanket punishment to apply to all physician-providers for years where Western Ohio was not profitable. We find that Western Ohio's refusal to return the reserve did not fall under the exception provided for by paragraph seven of the 1984 contract.

The amount of money in the reserves and the determination of when Western Ohio achieved sufficient financial stability to return the reserve funds are both questions of fact. Because we find that the trial court's findings were supported by competent, credible evidence, we defer to these findings of fact. See *Myers*, 66 Ohio St.3d at 614–615, 614 N.E.2d at 745–746, citing *Seasons Coal*, 10 Ohio St.3d at 80, 10 OBR at 410–411, 461 N.E.2d at 1276–1277. Although we disagree with the trial court's finding that the 1984 contract was unambiguous, our review of the extrinsic evidence leads us to conclude, like the trial court, that Western Ohio was obligated to return the reserve under both contracts. The first assignment of error is overruled.

Assignment of Error No. 2:

"The trial court committed reversible error in concluding that the payment of three million dollars to the physicians in 1993 was not a distribution with respect to spent PCR [Physicians' Contingency Reserve]."

In its second assignment of error, Western Ohio asserts that the trial court erroneously determined that the $3,000,000 payment made to physician-providers when the Plan was sold to United was not a distribution of reserve funds. Western Ohio notes that after distribution of the $3,000,000, the board of directors reduced the reserve account liability on its accounting books by $3,000,000.

As previously mentioned, where the decision in a case turns upon credibility of testimony, a reviewing court must defer to the findings of the trial court where competent and credible evidence supports these findings. *Myers*, 66 Ohio St.3d at 614–615, 614 N.E.2d at 745–746, citing *Seasons Coal*, 10 Ohio St.3d at 80, 10 OBR at 410–411, 461 N.E.2d at 1276–1277.

The trial court found that the $3,000,000 payment was a gift rather than a distribution of reserve. The trial court noted that this payment had been evenly divided among active physician-providers and had not been apportioned in correspondence with amounts previously contributed by each physician-provider. Each physician-provider had been awarded $1,710. A physician-provider who had accrued little or no reserve received the same amount of money as a physician-provider who had accrued a large reserve account balance. Moreover, a physician-provider who had joined the Plan in February 1993 would receive $1,710, while a physician-provider who had accrued a substantial reserve account

balance but who left Western Ohio in February 1993 would receive nothing. The manner by which Western Ohio distributed the $3,000,000 was consistent only with a bonus or incentive.

In a March 17, 1993 letter sent to the physician-providers, Western Ohio called the $3,000,000 disbursement "additional funds, above and beyond the discretionary reserve amount." Dr. Stephen House, a Director of Western Ohio, testified that Western Ohio did not consider the $3,000,000 disbursement as a return of the reserves but was "more in the nature of a good will offering to doctors who stayed with United after the sale." We agree with the trial court's finding that the $3,000,000 payment was not a distribution of reserve funds. Therefore, the second assignment of error is overruled.

Assignment of Error No. 3:

"The trial court committed reversible error in concluding that physicians who had terminated their relationship with the Plan had a legal claim to a distribution of spent PCR [Physicians' Contingency Reserve]."

In its third assignment of error, Western Ohio asserts that the trial court erred by concluding that physicians who had terminated their relationship with the Plan were entitled to the return of their reserve accounts. Western Ohio argues that this finding was not in accordance with the terms of the 1979 and 1984 contracts.

■ The language in the 1979 contract contains an illustration that references physician-providers whose relationship with the Plan has been terminated. Paragraph eleven of this contract (which is quoted in full above) contains in part the following:

"The Physician's pro rata share of such reserve whether established pursuant to this Section 11 or by contributions made by the Physician to such reserve beyond the obligations under this Section 11 shall be distributable to the Physician not later than the 90th day of the second year after the year in which such contribution or fee reduction is made by or for the Physician. *If the Physician's participation in the Plan terminates for any reason prior to the date when such distribution is permitted, the Physician shall not receive any part of such distribution until the date indicated above.*

"* * *

"Not later than March 31, 1981 the Physician shall be entitled to the distribution of $2,000 from the risk reserve fund for the year ending December 31, 1979 since his 10% share of that fund equals $2,000 as of the beginning of the second year after that initial year of participation. *This distribution would not be required before March 31, 1981 even though the Physician's participation in the*

*Plan may have terminated prior to December 31, 1979. \* \* \*"* (Emphasis added.)

Under these contract terms, there is no indication that a physician-provider who left the Plan would forfeit his or her reserve funds. Instead, the contract language above strongly suggests that a physician-provider whose relationship to the Plan has been terminated would be entitled to a distribution of reserve funds according to the above guidelines regarding when such distribution would be received. Therefore, we agree with the trial court's conclusion that the parties to the 1979 contract never intended to cancel a physician's reserve account as a consequence of the physician leaving the plan.

■ The 1984 contract contains language regarding the physician-provider whose relationship with the plan has been terminated in paragraph fifteen:

"This Agreement may be terminated without cause at any time by either party upon sixty days prior written notice to the other party. In the event of such termination, the Physician acknowledges that the Board of Directors may determine that the Physician is not entitled to the payment of any portion to the Reserve, provided, however, that the Corporation's Board of Directors may authorize payments of a portion of the Reserve to the Physician."

The trial court determined that this provision of the 1984 contract was, in effect, a forfeiture, and was therefore unenforceable. In so ruling, the trial court noted that it disagreed with the decision set forth in *Hodges v. W. Ohio Health Care Corp.* (June 21, 1994), Montgomery C.P. No. 93–4238, unreported. In *Hodges,* the Montgomery County Court of Common Pleas determined that a physician-provider who had voluntarily terminated his employment with Western Ohio was not entitled to the return of his reserves under paragraph fifteen of the 1984 contract. *Id.* at 7–8. In arriving at this conclusion, the court found that because the provision that provided for cancellation of the reserves of terminated physician-providers was not ambiguous, the clear language of the contract controlled, and no extrinsic evidence was to be considered. *Id.* at 6–7. Apparently, the court did not consider the issue of whether the provision was an unenforceable forfeiture clause. See *Hodges.*

■ The question of whether a stipulation in a contract constitutes liquidated damages, a penalty, or forfeiture is a question of law. *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 380, 613 N.E.2d 183, 186–187, citing *Ruckelshaus v. Broward Cty. School Bd.* (C.A.5, 1974), 494 F.2d 1164, 1165. Therefore, this court reviews this question *de novo.* See *Long Beach,* 82 Ohio St.3d at 576, 697 N.E.2d at 209, citing *Ohio Bell,* 64 Ohio St.3d at 147, 593 N.E.2d at 287.

■ Generally, parties are free to enter into contracts that include a provision that apportions damages in the event of default. *Lake Ridge,* 66 Ohio

St.3d at 381, 613 N.E.2d at 187–188. However, in certain circumstances, complete freedom of contract is not permitted for public policy reasons. *Id.* When stipulated damages constitute a penalty, freedom of contract is restrained. *Id.* "Because the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach, '[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.'" *Id.*, quoting 3 Restatement of the Law 2d, Contracts (1981) 154, Section 355. A punitive remedy subjects the breaching party to a liability "'disproportionate to the damage which could have been anticipated from breach of the contract * * *.'" *Lake Ridge* at 381, 613 N.E.2d at 188, quoting Williston on Contracts (3 Ed.1961) 668, Section 776. However, contracting parties may provide for damages to be paid in the event of a breach if the provision does not disregard the principle of compensation; these damages are considered to be liquidated damages. *Lake Ridge* at 381, 613 N.E.2d at 187–188, citing 3 Restatement of Contracts at 157, Section 356, Comment *a*.

 The test to determine whether a contract provision for stipulated damages provides for liquidated or punitive damages (forfeiture) is the following:

"Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 12 OBR 23, 465 N.E.2d 392, paragraph one of the syllabus, citing *Jones v. Stevens,* (1925), 112 Ohio St. 43, 146 N.E. 894, paragraph two of the syllabus.

Under the contract terms of paragraph fifteen of the 1984 contract (quoted above), the agreement "may be terminated without cause at any time by either party upon sixty days prior written notice to the other party." Therefore, a physician-provider who terminates his or her relationship with the plan does not breach the contract. Compared to paragraphs six and seven of the 1984 contract (also quoted above), paragraph fifteen seems to grant very broad, seemingly unlimited, discretion to the board of directors. Paragraph six outlines three reasons that justify the withholding of physicians' fees, and paragraph seven provides specific justifications for returning less than all funds that have been withheld. In contrast, paragraph fifteen contains no criteria to govern the board

of director's decision of whether or not a physician-provider whose participation in the Plan has been terminated is entitled to a disbursement of the reserve.

Evidence at trial demonstrated that paragraph fifteen of the 1984 contract does not apply to a physician-provider who has retired, because such physicians are regarded as active providers for the purposes of distribution of the reserve accounts. Even so, paragraph fifteen allows Western Ohio to terminate any physician-provider with sixty days' notice for any reason. Therefore, under Western Ohio's interpretation of the 1984 contract, Western Ohio could terminate any physician-provider without cause and refuse to pay that physician-provider his or her accumulated reserve account.

Dr. Rahman testified that refusing to return the reserve accounts of physician-providers who withdrew from the Plan was intended to be a penalty to force physician-providers to remain Plan participants. Dr. Rahman stated that Western Ohio did not try to determine how many physician-providers left during each year, the amount of reserve funds that corresponded to these physician-providers, or the extent of the harm caused by their departure.

Under such circumstances, paragraph fifteen of the 1984 contract acts as a forfeiture clause. Even if a physician-provider acted in a way that arguably constituted a breach of the contract and his or her reserve accounts were thereby withheld, this provision acts as a forfeiture provision, as there is no demonstration that the financial loss to the physician-provider was proportional to the anticipated harm from the "breach" of the contract. See *Lake Ridge*, 66 Ohio St.3d at 381, 613 N.E.2d at 187–188. See, also, *Cad Cam, Inc. v. Underwood* (1987), 36 Ohio App.3d 90, 521 N.E.2d 498.

For these reasons, we agree with the trial court's finding that paragraph fifteen of the 1984 contract, which permits Western Ohio to cancel the reserve account of a physician-provider who is terminated without cause, is an unenforceable forfeiture provision. Western Ohio's third assignment of error is overruled.

Assignment of Error No. 4:

"The trial court committed reversible error in awarding prejudgment interest for the entire time period of October 1, 1992 through March 13, 1998."

In its fourth assignment of error, Western Ohio argues that the trial court's award of prejudgment interest for the time period of October 1, 1992 through March 13, 1998 was inappropriate.

R.C. 1343.03 provides for a trial court's award of prejudgment interest. R.C. 1343.03(A) states:

"[W]hen money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees,

and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, except that, if a written contract provides a different rate of interest in relation to the money that becomes due and payable, the creditor is entitled to interest at the rate provided in that contract."

A trial court's decision to allow prejudgment interest will be upheld absent an abuse of discretion. *Wagner v. Midwestern Indemn. Co.* (1998), 83 Ohio St.3d 287, 292, 699 N.E.2d 507, 512, citing *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 202–203, 495 N.E.2d 572, 573–574. " '[P]rejudgment interest does not punish the party responsible for the underlying damages * * *, but, rather, it acts as compensation and serves ultimately to make the aggrieved party whole. Indeed, to make the aggrieved party whole, the party should be compensated for the lapse of time between accrual of the claim and judgment.' " *Heinz v. Steffen* (1996), 112 Ohio App.3d 174, 188, 678 N.E.2d 264, 273, quoting *Royal Elec. Constr. Corp. v. Ohio State Univ.* (1995), 73 Ohio St.3d 110, 117, 652 N.E.2d 687, 692.

The trial court found that prejudgment interest should be awarded for the breach of contract. On August 11, 1998, the trial court filed an entry in which it stated that prejudgment interest would run from October 1, 1992, the date on which Western Ohio should have returned the reserve to the physicians, and would continue to accrue through March 13, 1998, the date the trial court issued its partial findings of fact and conclusions of law.

Western Ohio argues that it was improper for the trial court to allow prejudgment interest to accrue up until the date that the trial court issued its preliminary findings of fact and conclusions of law, especially where the length of time that passed from the conclusion of the bench trial to the date of the trial court's partial findings of fact and conclusions of law was nearly two years. Although the trial court's deliberation took a long time, this was a complicated case, which required interpretation of two contracts and the consideration of extrinsic evidence, which filled nearly nine hundred pages of trial court transcript and numerous exhibit binders. The physicians should not be denied prejudgment interest during the trial court's deliberation time; had Western Ohio returned the reserves to the physicians as required by the contracts, this complicated litigation would not have been necessary. Therefore, we find that the trial court's prejudgment award was not an abuse of discretion. Western Ohio's fourth assignment of error is overruled.

*Judgment affirmed.*

POWELL, P.J., and WILLIAM W. YOUNG, J., concur.

STEPHEN W. POWELL, P.J., of the Twelfth Appellate District, sitting by assignment.

WILLIAM W. YOUNG, J., of the Twelfth Appellate District, sitting by assignment.

JAMES E. WALSH, J., of the Twelfth Appellate District, sitting by assignment.