OPINION
{¶ 1} Appellant, Cognis Corporation ("Cognis"), appeals the September 18, 2006, judgment of the Ashtabula County Court of Common Pleas, in which it granted appellee, Gabriel Performance Products LLC's ("GabePro"), motion for reconsideration of its summary judgment motion on its breach of contract claim. For the following reasons, we affirm. *Page 2 
 {¶ 2} Background History
 {¶ 3} This appeal concerns the interpretation of three manufacturing agreements entered into between the parties and involves the issue of whether any of those agreements created a written contractual duty of nonuse or confidentiality enforceable by Cognis against GabePro regarding a product known as CAPCURE.[1]
 {¶ 4} The Transfer of the CAPCURE technology to Cognis
 {¶ 5} In the 1960's, Diamond Alkali Company, which later became Diamond Shamrock Corporation, and then Diamond Shamrock Chemicals Company ("DSCC"), developed a hardening agent it called CAPCURE. CAPCURE is a mercaptan resin hardening agent that is sold to adhesive formulators who use it as an ingredient in their adhesive products. CAPCURE is manufactured at a plant in Ashtabula, Ohio.
 {¶ 6} Over the years, different corporate entities have possessed the CAPCURE technology and the right to manufacture the product. With respect to the CAPCURE technology itself, Diamond Alkali held the patent from October 11, 1966 until its expiration on October 11, 1983. On September 4, 1986, in a stock purchase agreement, Occidental Petroleum Corporation acquired all the stock of DSCC and with DSCC the CAPCURE technology.
 {¶ 7} On September 23, 1986, as evidenced by a document entitled "Assignment and Assumption Agreement," DSCC through its Process Chemicals company, transferred its chemical business to one of its wholly owned subsidiaries, Oxy Process Chemicals Inc. ("Process"). Also on that date, DSCC changed its name to Occidental Electrochemical Corporation ("OEC"). *Page 3 
 {¶ 8} On December 9, 1986, Henkel Corporation purchased all the shares of Process for $ 192 million. Until this stock purchase, the CAPCURE technology and the plant where CAPCURE was produced were both owned by the same entity or permutation of the Diamond Shamrock/Occidental Petroleum family of companies. Henkel did not want to buy the Ashtabula plant where CAPCURE was manufactured, so Process transferred it to OEC. As part of the transfer, OEC and Process entered into the 1987 manufacturing agreement on March 30, 1987. Three subsequent manufacturing agreements (in 1989, 1996, and 2004) superseded the 1987 agreement.
 {¶ 9} In 1999, Henkel transferred its chemical business along with the CAPCURE technology to Cognis. Cognis assumed Henkel's rights and obligations under the 1996 manufacturing agreement.
 {¶ 10} The Acquisition of the Ashtabula Manufacturing Plant byGabePro
 {¶ 11} Initially, DSCC was the entity that manufactured CAPCURE at its Ashtabula plant. In 1986, OEC and later OxyChem, as a subsidiary of Occidental, subsequently took over the Ashtabula manufacturing plant. On May 17, 2001, OxyChem sold the Ashtabula plant to GabePro. As part of that sale, GabePro assumed OEC's and then Oxychem's rights and obligations under the 1996 manufacturing agreement and began manufacturing CAPCURE for Cognis.
 {¶ 12} GabePro Begins to Manufacture Its Own Competitive HardeningAgent
 {¶ 13} In late 2002, Cognis notified GabePro that it intended to make its adhesive product at a plant it owned in Spain, and that it intended to terminate the 1996 manufacturing agreement on December 31, 2003. However, because its facility was *Page 4 
not yet ready at the end of 2003, Cognis proposed to GabePro that they extend the 1996 agreement. GabePro refused, and the agreement expired. Nevertheless, the parties entered into a new agreement in January 2004, which expired on July 31, 2004.
 {¶ l4} In the interim, in the early part of 2004, GabePro made the decision to manufacture its own adhesive product called GPM-800. GabePro's product is identical to the specifications of CAPCURE and uses the same CAPCURE process and technology to manufacture the product.
 {¶ 15} When Cognis learned that GabePro was selling its own product to former Cognis customers, Cognis protested on the ground that the manufacturing agreements prohibited GabePro from using the CAPCURE technology for its own purposes. On March 17, 2004, Cognis advised GabePro in writing that CAPCURE was "a one of a kind product" and that it believed it had the exclusive right to produce this type of product. Cognis also claimed that GabePro was subject to "obligations of confidentiality and non-use" and that it did not have the right to develop a competitive product. GabePro disputed these claims and this lawsuit ensued.
 {¶ 16} Procedural History
 {¶ 17} On April 14, 2004, GabePro filed a complaint, seeking a declaratory judgment that it had the unrestricted right to produce the hardening agent, that the information used to produce the product is not confidential or proprietary information belonging to Cognis, and that the manufacture of the product does not violate any contractual obligation owed to Cognis. *Page 5 
 {¶ 18} Cognis filed its answer, counterclaim and motion for preliminary injunction on June 1, 2004, alleging that GabePro's use of the CAPCURE technology was a misappropriation of trade secrets and a breach of contract.[2]
 {¶ 19} Both parties filed motions for summary judgment. Cognis, in its motion for partial summary judgment, asked the trial court to hold as a matter of law that it owned the CAPCURE hardening agent technology. In its summary judgment motion, GabePro asked the court to rule that the CAPCURE technology is not a trade secret and that Cognis cannot prevent it from using the technology to manufacture and sell a similar product.
 {¶ 20} In its October 12, 2004 order, the trial court granted partial summary judgment in favor of Cognis holding that the "documents effecting the various transfers of [the] original specialty chemicals business demonstrate the ultimate acquisition, by Cognis Corporation, of the technology for the manufacture of the CAPCURE 3-800 mercaptan hardening agent." The court ruled against GabePro on the ground that it could not find as a matter of law that the hardening agent technology was a trade secret.
 {¶ 21} A preliminary injunction hearing was held from October 19 through October 22, 2004. On December 16, 2005, the trial court denied Cognis' request for a preliminary injunction. On March 6, 2006, GabePro moved the trial court to reconsider its denial of its summary judgment motion. Cognis filed a response and cross-motion. In its August 31, 2006 judgment entry, the trial court denied GabePro's motion for reconsideration of its motion for summary judgment and denied Cognis' motion for partial summary judgment. The court found that none of the manufacturing agreements *Page 6 
between the parties and their predecessors created contractual duties of nonuse or confidentiality with respect to the CAPCURE technology. Therefore, it held that Cognis could not rely on any of the manufacturing agreements to enforce nondisclosure or nonuse of the technology against GabePro.
 {¶ 22} Cognis filed a motion for reconsideration of the August 31, 2006 judgment entry, which the court denied. However, because it previously found that none of the manufacturing agreements created a written contractual duty of nonuse or confidentiality enforceable by Cognis against GabePro, on reconsideration, the court granted GabePro's motion for summary judgment on Cognis' breach of contract claim.
 {¶ 23} Cognis filed the instant appeal, raising one assignment of error for our review:
 {¶ 24} "The trial court erred when it granted summary judgment in favor of Appellee and denied Appellant's motion for summary judgment, thereby dismissing Appellant's breach of contract claim."
 {¶ 25} The 1987 Agreement
 {¶ 26} The first issue we must decide is whether the 1987 manufacturing agreement created a duty of confidentiality and nonuse with respect to the CAPCURE technology, which would prevent GabePro from using this technology for its own purposes and from producing and selling a competitive product.
 {¶ 27} At the outset, we note that "the construction of a written contract is a question of law, which we review de novo." In re: Kelley Ferraro Asbestos Cases, 104 Ohio St.3d 605, 2004-Ohio-7104, at ¶ 28. Furthermore, in construing the terms of a written contract, the primary objective is to give effect to the intent of the parties. Id. *Page 7 
at ¶ 29. Thus, "[w]here the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. * * * Where possible, a court must construe the agreement to give effect to every provision in the agreement." Id. See, also, National City Bank v. Concorde Controls,Inc., 11th Dist. No. 2001-L-113, 2002-Ohio-6578, at ¶ 24; Dalejo Farm,Inc. v. Approved Statewide Title Agency Corp., 11th Dist. No. 2005-P-0090, 2006-Ohio-6351, at ¶ 27.
 {¶ 28} Conversely, where the language employed in a contract is not clear but is ambiguous, we must look at "the overall content of the Agreement, as well as extrinsic evidence, in order to ascertain the parties' intent." Dalejo at ¶ 30. Contractual language is ambiguous where its meaning cannot be derived from the four corners of the agreement or where the language is susceptible to differing interpretations. Westbrook v. Western Ohio Health Care Corp. (2000), 137 Ohio App.3d 304, 311.
 {¶ 29} With these principles in mind, we turn to the language used in the 1987 agreement. Section 4(a) of the 1987 agreement states in pertinent part:
 {¶ 30} "All technology, know-how and patents supplied to OEC [later called Oxychem, which sold to GabePro] by Process [later sold to Henkel, then Cognis] hereunder for the production of Products not previously possessed by OEC [GabePro] or thereafter acquired by OEC [GabePro] other than in an authorized disclosure by Process [Cognis] hereunder shall remain the property of Process [Cognis] and be subject to the restrictions set forth in Exhibit "F"; provided, that, technology,know-how and patents possessed by Process [Cognis] or the Unit as of theClosing Date and related to the production of Products, shall remain the exclusive property of Process [Cognis] and be so subject." (Emphasis added.) *Page 8 
 {¶ 31} Exhibit F of the agreement limits the disclosure of confidential information for a period of ten years. The term "information" is defined in pertinent part as:
 {¶ 32} "all technical, commercial, financial, and other information disclosed to or acquired by you in any manner directly or indirectly by Process [Cognis], provided that, Information shall not include any information that you can reasonably demonstrate: * * * (b) was in your possession prior to being obtained from Process [Cognis], as demonstrated by written records * * * ."
 {¶ 33} In arguing that section 4(a) of the agreement is subject to the confidentiality and non-use provisions of Exhibit F, Cognis contends that the above-italicized clause that begins with the words "provided that" provides an exception to the language used preceding it. Thus, Cognis urges us to construe this clause to mean that the CAPCURE technology possessed by Process [and later Cognis] as of the closing date is subject to the confidentiality and non-use restrictions regardless of whether OEC [GabePro] previously possessed it. Cognis further argues that the trial court erred in failing to use the correct closing date of March 30, 1987, and as a result, incorrectly found that the CAPCURE technology was not possessed by Process [Cognis] as of the closing date.
 {¶ 34} We reject Cognis' interpretation of the contractual language. The clause at issue, which we will refer to as the "provided that" clause for expediency's sake, is not, as Cognis asserts, an exception to the superordinate first clause of paragraph 4(a). When paragraph (a) is read as a whole, it appears that that the "provided that" clause simply reiterates what is stated in the first clause. Specifically, the superordinate first clause unambiguously states that whatever technology was supplied to OEC (and later *Page 9 
transferred to GabePro) and was not previously possessed by OEC, shall remain Process (and later Cognis') property and be subject to the restrictions of Exhibit F. The conditional, subordinate second clause then restates the fact that whatever technology Process (Cognis) possessed as of the closing date (March 30, 1987) shall remain the property of Process (Cognis) and be subject to Exhibit F. (Emphasis added.)
 {¶ 35} Since both the superordinate clause and the subordinate clause of paragraph 4(a) refer directly or indirectly, respectively, to restrictions of Exhibit F, we must turn our attention to Exhibit F, which imposes confidentiality restrictions of "information" in order to complete the interpretation of this provision.
 {¶ 36} Excluded from the definition of confidential information is that information that "was in your possession prior to being obtained from Process [Cognis] * * *." (Section 1(b)) Because the formula for producing CAPCURE was known, possessed, and used by GabePro's predecessors continuously since the 1960's, GabePro argues that under the exclusion found in Exhibit F, § 1(b) of the agreement does not impose any duty of confidentiality.
 {¶ 37} We agree. In tracing the chain of succession of the various corporate entities, through the assorted written records, it is important to note that until the stock purchase agreement of December 9, 1986, by which Henkel purchased all shares of stock of Process, the CAPCURE technology itself and the manufacturing of the CAPCURE product were under the possession and control of one entity, namely DSCC and its successors and/or subsidiaries (Occidental Petroleum Company, OEC and Process on the ownership end; and Occidental Petroleum Company, OEC and then its subsidiary Oxy-Chem on the manufacturing end). It was not until Henkel purchased the *Page 10 
shares of stock of Process that an "outside" entity had any interest in the CAPCURE technology. Thus, the CAPCURE technology and manufacturing know-how was clearly within the knowledge of GabePro's predecessors (OxyChem, OEC, Occidental Petroleum and DSCC) prior to being obtained from Process. Since this technology was in OEC's and its predecessors' possession prior to being obtained from Process, the information GabePro ultimately possessed regarding the CAPCURE technology is excluded from any confidentiality and non-use restrictions set forth in section 1(b) of Exhibit F of the 1987 manufacturing agreement.
 {¶ 38} The fact that the trial court used the incorrect closing date is immaterial. While both parties concede that the court should have used March 30, 1987, as the correct closing date, since the information regarding the CAPCURE technology was in GabePro and their predecessors' possession well before the actual closing date, the trial court still reached the correct result despite citing the incorrect date.
 {¶ 39} The 1989 and 1996 Agreements
 {¶ 40} Cognis alternatively argues that even if the 1987 agreement did not contain binding confidentiality and non-use provisions, the subsequent 1989 and 1996 agreements did.
 {¶ 41} The 1989 agreement, entered into between Henkel [Cognis] and OxyChem [GabePro], contained the following language pertaining to confidentiality, found in section 3(a):
 {¶ 42} "The Products, processes and all technology related thereto are the property of Henkel and shall remain the property of Henkel during the life of this Agreement and for all times thereafter. To enable OxyChem to manufacture Products *Page 11 
hereunder, OxyChem will have access to confidential information of Henkel, including but not limited to the information contained in the Exhibits hereto. Both during the term of this Agreement and for seven (7) years thereafter, OxyChem agrees to hold such confidential information in confidence and to exercise all reasonable precautions to prevent disclosure thereof to others, and OxyChem further agrees to use such Confidential Information only for the purposes of this Agreement."
 {¶ 43} The 1996 agreement contained similar language regarding confidentiality. However, it stated that the term of the agreement was for five (5) years.
 {¶ 44} Although the 1989 and 1996 agreements stated that they superseded prior agreements, both of the agreements contained integration clauses that bound the parties to the confidentiality provisions specified in the 1987 agreement. Specifically, paragraph 20 of these agreements states that the agreements "shall not terminate the obligations of OxyChem and its predecessors under confidentiality agreements entered into as part of the March 31, 1987 and November 1, 1987 Manufacturing Agreements." By this express language, the parties explicitly incorporated the confidentiality provisions inherent in the 1987 agreement into the 1989 and 1996 agreements.
 {¶ 45} In this regard, Cognis' reliance on Wesco Ventures, Inc. v. Ingram Micro, Inc.
(6th Cir. 1997), No. 95-6425, 1997 U.S. App. LEXIS 7720, at 11, is misplaced. In that decision, the court held that the language in a prior contract had no bearing on the parties' current contract since the parties renegotiated the current contract. As a result, the court found no reason to rely on the language in the prior contract to interpret the current contract. In contrast, in the case at hand, both the 1989 and 1996 agreements included express integration clauses that bound the parties to the relevant *Page 12 
confidentiality provisions of the 1987 agreement. Thus, unlike the situation presented in Wesco, here it is imperative to rely on the language used in the 1987 agreement to determine what information is deemed confidential in subsequent agreements.
 {¶ 46} Since we have found that the CAPCURE technology is not subject to the confidentiality and non-use provisions of the 1987 agreement, and because the confidentiality provisions of the 1987 agreement carry over to the subsequent agreements, we find that the parties are bound by the terms of the 1987 agreement. The fact that the parties entered into another agreement in 2004 is immaterial since that agreement does not impose any new obligations regarding confidentiality or non-use restrictions. The language of the 2004 agreement provided that "neither Party intends to waive any intellectual property or ownership rights relating to Products or the toll manufacture of Products that the Parties may have at the time of execution of this Agreement."
 {¶ 47} Consequently, we hold that the manufacturing agreements the parties entered into did not create a duty of confidentiality and non-use regarding the CACPCURE technology that was enforceable by Cognis against GabePro. Accordingly, the trial court was warranted in entering judgment in favor of GabePro on Cognis' breach of contract claim. We overrule Cognis' assignment of error.
 {¶ 48} The judgment of the Ashtabula County Court of Common Pleas is affirmed.
WILLIAM M. O'NEILL, J., DIANE V. GRENDELL, J., concur.
[1] The parties refer to the hardening agent as both CAPCURE and the "Standard Formula." We will refer to the product as CAPCURE, as did the trial court.
[2] Cognis also filed an intentional interference with business claim, which it dismissed. *Page 1