MARK–IT PLACE FOODS, INC., d.b.a. Festival
Foods, Appellant and Cross–Appellee,

v.

NEW PLAN EXCEL REALTY TRUST, INC. et al., Appellees and Cross–Appellants.

[Cite as *Mark–It Place Foods, Inc. v. New Plan Excel
Realty Trust,* 156 Ohio App.3d 65, 2004-Ohio-411.]

Court of Appeals of Ohio,
Fourth District, Scioto County.

No. 02CA2863.

Decided Jan. 26, 2004.

68

70

Stanley C. Bender, for appellant and cross-appellee Mark–It Place Foods, Inc., d.b.a. Festival Foods.

Miller, Searl & Fitch and R. Alan Lemons;  Day, Ketterer, Raley, Wright & Rybolt, Ltd., James K. Brooker and Robert J. McBride, for appellant Fleming Companies, Inc.

Satzberg, Trichon, Kogan & Wertheimer, P.C., Mark E. Kogan and Christopher N. Jones;  and Ruggiero & Haas and Daniel P. Ruggiero, for appellee and cross-appellant New Plan Excel Realty Trust, Inc.

PETER B. ABELE, Judge.

{¶ 1} This is an appeal from several Scioto County Common Pleas Court judgments that resolved various claims between Mark–It Place Foods, Inc., d.b.a. Festival Foods ("Festival"), plaintiff below and appellant herein, Fleming Companies, Inc. ("Fleming"), defendant below and appellant herein, and New Plan Excel Realty Trust, Inc. ("New Plan"), defendant below and cross-appellant herein. Festival assigned the following errors for our review:

## FIRST ASSIGNMENT OF ERROR

"The trial court erred in failing to grant summary judgment in favor of Mark–It Place Foods, Inc., dba Festival Foods, on its complaint against New Plan Excel Realty Trust, Inc."

## SECOND ASSIGNMENT OF ERROR

"The trial court erred in granting summary judgment to New Plan Excel Realty Trust, Inc., against Mark–It Place Foods, Inc., dba Festival Foods."

## THIRD ASSIGNMENT OF ERROR

"The trial court erred in failing to construe the facts most favorably to Mark–It Place Foods, Inc., dba Festival Foods, when ruling on the motion for summary judgment by New Plan Excel Realty Trust, Inc."

## FOURTH ASSIGNMENT OF ERROR

"The trial court erred in holding that privity of contract prevent[ed] Mark–It Place Foods, Inc., dba Festival Foods, from maintaining an action directly against New Plan Excel Realty Trust, Inc., for breach of contract."

## FIFTH ASSIGNMENT OF ERROR

"The trial court erred in holding that Mark–It Place Foods, Inc., dba Festival Foods, could not maintain an action directly against New Plan Excel Realty Trust, Inc., as third-party of the lease."

## SIXTH ASSIGNMENT OF ERROR

"The trial court erred in holding that the estoppel letters can be considered as evidence of reasonable reliance by New Plan Excel Realty Trust, Inc."

## SEVENTH ASSIGNMENT OF ERROR

"The trial court erred when it failed to hold, as a matter of law, that the lease was clear and unambiguous on its face, that Mark–It Place Foods, Inc., dba Festival Foods, and Fleming Companies, Inc. had the exclusive right to sell foodstuffs and that a sale of foodstuffs by Wal–Mart violated the lease."

## EIGHTH ASSIGNMENT OF ERROR

"The trial court erred when it considered parol evidence to change a contract clear and unambiguous on its face."

## NINTH ASSIGNMENT OF ERROR

"The trial court erred in holding that Mark–It Place Foods, Inc., dba Festival Foods, and Fleming Companies, Inc., could not recover from New Plan Excel Realty Trust, Inc., rents paid under protest."

## TENTH ASSIGNMENT OF ERROR

"The trial court erred in holding that R.C. [Chapter] 1331 had application to the lease."

## ELEVENTH ASSIGNMENT OF ERROR

"The trial court erred in finding Section 6.3 of the lease to be 'overbroad'."

{¶ 2} Fleming advances its own assignments of error as follows:

## FIRST ASSIGNMENT OF ERROR

"The trial court erred in granting summary judgment to New Plan Excel Realty Trust, Inc. on Fleming Companies, Inc.'s cross-claim against New Plan."

## SECOND ASSIGNMENT OF ERROR

"The trial court erred in denying the motion for summary judgment of Fleming Companies, Inc. on its cross-claim against New Plan."

## THIRD ASSIGNMENT OF ERROR

"The trial court erred in granting summary judgment to New Plan on its cross-claim against Fleming."

{¶ 3} Finally, New Plan posits the following cross-assignments of error for review:

## FIRST CROSS–ASSIGNMENT OF ERROR

"The trial court erred in holding that an issue of fact existed as to New Plan Excel Realty Trust, Inc.'s ('New Plan') reasonable reliance on the valid estoppel letter signed by Fleming Companies, Inc. ('Fleming') and Mark–It Place Foods, Inc. ('Mark–It'), and that New Plan was not entitled to judgment as a matter of law based on its estoppel theories."

### SECOND CROSS–ASSIGNMENT OF ERROR

"The trial court erred in failing to hold that under the interpretation of Section 6.3 of the lease urged by Fleming and Mark–It the rent abatement would constitute an unenforceable penalty."

{¶ 4} In the late 1980s, Wal–Mart Stores, Inc. ("Wal–Mart") began to explore the possibility of opening a store in the Scioto County area. Wal–Mart retained the services of Leo Eisenberg Co. ("Eisenberg"), a nationwide developer and shopping-center manager, to examine the area. Eisenberg found an appropriate location in New Boston. Eisenberg then formed the New Boston Development Company ("NBDC") to build and to later own the shopping center intended to house the new Wal–Mart store. NBDC sought other tenants for the shopping center as well and, on July 27, 1989, entered into a "shopping-center lease" ("the lease") whereby it agreed to let 52,628 square feet to Scrivner, Inc. ("Scrivner"), for use as a supermarket. That lease contained the following "exclusive-use" provision:

"Neither Lessor nor any affiliate or related party shall, without Lessee's prior written consent, own, operate or grant any lease or permit any assignment or sublease for a store (or any portion of a store) in the Shopping Center or any of Lessor's real estate located within 1,500 yards of the Shopping Center which permits a tenant under such lease to *sell or offer for sale groceries, meats, poultry, seafood, dairy products, fruits, vegetables or baked goods,* provided these restrictions shall not be deemed to prohibit a restaurant serving pre-pared food." (Emphasis added.)

{¶ 5} In November of that year, NBDC leased a 112,238 square foot building and garden center in the shopping center to Wal–Mart. The lease did not include any provision to prohibit Wal–Mart from selling any of the items listed in the above-cited exclusive-use provision,[1] and it is undisputed that, "from its opening day," Wal–Mart sold foodstuffs such as "chips, nuts, beverages, cereal, cookies, canned meats, pasta and other convenience food items."

{¶ 6} On June 14, 1990, Scrivner assigned its leasehold interest to S.M. Flickinger Co. ("Flickinger"), which, on January 9, 1991, entered into a "sublease agreement" subletting the premises to Festival. Fleming is the successor in interest to Flickinger.

{¶ 7} In 1992, NBDC decided to sell the shopping center. New Plan expressed interest in acquiring the property and began examining the shopping-center leases. It appears that during the course of this examination process, New Plan may have discovered both the exclusive-use covenant in Scrivner's lease (the

---

1. The lease provided that Wal–Mart could use the demised premises for "any lawful purpose."

property occupied by Festival Foods under the aforementioned sublease) and the absence of a reciprocal restrictive-use covenant in Wal–Mart's lease. In any event, New Plan sent an "estoppel letter" to NBDC and to Fleming asking, among other things, their assurances that there were "no defaults under the terms of the [l]ease." NBDC and Scrivner executed the letter and signified their assent to that representation. Festival, likewise, consented to "execution and delivery of [the] Estoppel Letter."[2] An updated "tenant estoppel certificate," reaffirming that there were no breaches in the lease, was provided to New Plan two months later. On the basis of those assurances, New Plan acquired the shopping center in early 1993.

{¶ 8} In December 1998, Fleming sent a letter to New Plan to notify the company that Wal–Mart was selling foodstuffs at its New Boston store in violation of its assigned lease's exclusive-use provision. Fleming asked that New Plan promptly take action to "ensure that Wal–Mart immediately discontinue the sale of groceries, meats, poultry, seafood, dairy products, fruits, vegetables or baked goods to the public." No action was taken, and Fleming discontinued its rental payments.[3]

{¶ 9} Festival commenced the instant action on November 17, 1999, and alleged that New Plan and Fleming had violated the lease's terms by permitting Wal–Mart to sell foodstuffs. The sublessee asked for damages, as well as a declaratory judgment to construe its rights and obligations under the lease.

{¶ 10} Fleming denied liability to its sublessee. Fleming also filed a cross-claim against New Plan and alleged that the lessor breached the lease by permitting Wal–Mart to sell foodstuffs. Like Festival, Fleming asked for damages and a declaration of its rights and obligations under the lease. New Plan denied liability on the complaint and the cross-claim. The lessor also filed a cross-claim and counterclaim against its sublessor and sublessee and alleged that they were in default for failure to pay rent. New Plan asked for, inter alia, all rental payments due under the lease as well as possession of the demised premises.

{¶ 11} These matters proceeded through a lengthy discovery process and, on February 23, 2001, all parties filed motions for summary judgment on their respective claims. On March 9, 2001, the trial court issued its decision and

---

2. The letter also provided that it would "be void and of no effect if it [was] not executed by all parties hereto, including the *Purchaser*. * * *" (Emphasis added.) It appears from the copies of the letter in the record that New Plan never executed the document.

3. The exclusive-use provision of the lease also contained a rent-abatement clause that provided that in the event of any violation of its terms by the lessor, rent payment obligations would be "abated during the period of such violation."

judgment and addressed many of the different issues in the competing claims, counterclaim, and cross-claims.

{¶ 12} First, the trial court held that Festival was a sublessee in the shopping center and could not bring an action against New Plan on the original lease, because no privity of contract existed between them. Second, the trial court concluded that no breach of the lease's exclusive-use provision occurred by permitting Wal–Mart to sell particular food items. In reaching that conclusion, the court found that the provision was "overbroad" and should be construed only "to prohibit other supermarkets in the New Boston Shopping Center and any other store primarily engaged in the sale of foodstuffs." In view of the fact that Wal–Mart was not a "supermarket," and was not primarily engaged in sale of foodstuffs, the court concluded that New Plan did not violate its lease with Fleming. Thus, the court granted summary judgment in favor of New Plan on both the complaint and the cross-claim. The trial court also found that this judgment rendered moot Festival's claim against Fleming.[4]

{¶ 13} That same day, the trial court issued an entry that cancelled a scheduled trial date and directed New Plan to file a motion for summary judgment on its cross-claim for rent against Fleming. New Plan filed its motion on March 27, 2001, and argued that Fleming owed $846,729.88 in rent.[5] Further, New Plan argued that although it was entitled to cancel the lease for nonpayment of rent, it would "defer exercising" that right unless Fleming failed to pay rent in the future.

{¶ 14} The trial court issued its decision on October 24, 2001, and granted New Plan summary judgment against Fleming in the amount of $846,729.88, together with interest at the rate of one and a half percent (1½ percent) per month. Although the court did not rule on the issue of whether New Plan was entitled to retake possession of the premises as a result of Fleming's breach of the lease, the court did state that "New Plan may not terminate the lease and retake possession upon any *future default* by Fleming to pay rent or other charges due under the lease until such time as the Fourth District Court of Appeals has an opportunity to rule on this Court's earlier decision." (Emphasis added.)

---

4. Various other issues were also addressed in the trial court's judgment, including (1) finding that it remained a genuine issue of material fact as to whether New Plan could reasonably rely on the estoppel letter and estoppel certificate to defend against a claim of breach and (2) holding that the lease's rent-abatement provision was a liquidated-damages clause rather than an unenforceable penalty provision. However, because the court concluded that no breach occurred by allowing Wal–Mart to sell food items, these issues were largely irrelevant at the time.

5. An affidavit by Daniel S. Dornfeld, corporate counsel for New Plan, verified that this was the correct amount of rent due and owing under the lease.

{¶ 15} Several appeals were taken from those judgments but were ultimately dismissed by this court for the lack of a final appealable order. See *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.,* Scioto App. Nos. 01CA2816 and 01CA2817, 2002-Ohio-3704, 2002 WL 1676323. The matter was remanded to the trial court for the resolution of (1) New Plan's counterclaim against Festival and (2) New Plan's demand for restitution of the premises. On November 12, 2002, the trial court issued a judgment in favor of Festival on New Plan's counterclaim for rent payments, but in favor of New Plan on its claim for restitution of the premises.[6] This appeal followed.[7]

## I

{¶ 16} Before we review the merits of the assignments of error, we pause to address the standard of review. Most of the claims at issue were resolved by summary judgment. We note that appellate courts review summary judgments de novo. See *Broadnax v. Greene Credit Serv.* (1997), 118 Ohio App.3d 881, 887, 694 N.E.2d 167; *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41, 654 N.E.2d 1327; *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765. In other words, appellate courts afford no deference to a trial court's summary judgment decision, see *Hicks v. Leffler* (1997), 119 Ohio App.3d 424, 427, 695 N.E.2d 777; *Dillon v. Med. Ctr. Hosp.* (1993), 98 Ohio App.3d 510, 514–515, 648 N.E.2d 1375; *Morehead v. Conley* (1991), 75 Ohio App.3d 409, 411–412, 599 N.E.2d 786, and conduct their own independent review to determine whether summary judgment was appropriate. *Woods v. Dutta* (1997), 119 Ohio App.3d 228, 233–234, 695 N.E.2d 18; *Phillips v. Rayburn* (1996), 113 Ohio App.3d 374, 377, 680 N.E.2d 1279; *McGee v. Goodyear Atomic Corp.* (1995), 103 Ohio App.3d 236, 241, 659 N.E.2d 317.

{¶ 17} Summary judgment under Civ.R. 56(C) is appropriate when a movant can demonstrate that (1) no genuine issues of material fact exist; (2) the movant is are entitled to judgment in its favor as a matter of law; and (3) reasonable minds can come to only one possible conclusion and that conclusion is adverse to the opposing party, with the evidence construed most strongly in favor of the nonmoving party. *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201; *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d

---

6. This portion of the trial court's judgment was directed solely at Fleming because Festival had, apparently, already surrendered possession of the premises to Fleming.

7. On January 15, 2003, this court issued an order to permit the case sub judice to proceed on the basis of the briefs and assignments of error filed in the consolidated cases that had previously been dismissed. We also agreed to address whether New Plan was entitled to restitution of the premises without requiring any further briefs by the parties on that issue.

64, 66, 8 O.O.3d 73, 375 N.E.2d 46. We further note that parties moving for summary judgment bear the initial burden of showing that no genuine issues of material fact exist and that the moving party is entitled to judgment in its favor as a matter of law. See *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 429, 674 N.E.2d 1164; *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264; *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 115, 526 N.E.2d 798. Once that burden is met, the onus shifts to the nonmoving party to provide rebuttal evidentiary materials. See *Trout v. Parker* (1991), 72 Ohio App.3d 720, 723, 595 N.E.2d 1015; *Campco Distributors, Inc. v. Fries* (1987), 42 Ohio App.3d 200, 201, 537 N.E.2d 661; *Whiteleather v. Yosowitz* (1983), 10 Ohio App.3d 272, 275, 10 OBR 386, 461 N.E.2d 1331. With these principles in mind, we turn our attention to the proceedings below and to the parties' assignments of error.

## II

{¶ 18} We jointly consider Festival's fourth and fifth assignments of error, as they are dispositive of its claims in this case. The trial court held, in essence, that even if a breach of the shopping-center lease occurred by virtue of Wal–Mart's selling foodstuffs, Festival could not maintain an action against New Plan because it is a sublessee of Fleming and had no privity of contract with the successor in interest to the original lessor. Festival argues that the court erred in that ruling. We disagree with Festival.

{¶ 19} It is well settled that no privity of contract exists between a sublessee and an original lessor. See *Crowe v. Riley* (1900), 63 Ohio St. 1, 9, 57 N.E. 956; see, also, *Zevchik v. Kassai* (Dec. 24, 1997), Cuyahoga App. No. 71823, 1997 WL 793135; *Houser v. Columbia Gas Transm. Corp.* (1988), 54 Ohio App.3d 145, 561 N.E.2d 980. More than a century ago, the Ohio Supreme Court held that a lessor cannot maintain an action against a sublessee for breach of covenant in an original lease. *Crowe*, supra, 63 Ohio St. at 9, 57 N.E. 956. Subsequent cases have likewise held that sublessees cannot maintain actions against the lessor on the original lease. See *Cleveland v. A.J. Rose Mfg. Co.* (1993), 89 Ohio App.3d 267, 271, 624 N.E.2d 245; *Hooper v. Seventh Urban, Inc.* (1980), 70 Ohio App.2d 101, 109, 24 O.O.3d 126, 434 N.E.2d 1367; *House of LaRose Cleveland, Inc. v. Lakeshore Power Boats, Inc.* (Jun. 18, 1992), Cuyahoga App. No. 60904, 1992 WL 140074. The sublessee must, instead, seek redress against its sublessor—the original lessee. *Coffman v. Huber* (1965), 13 Ohio Misc. 126, 128, 42 O.O.2d 169, 232 N.E.2d 676.[8]

---

8. These are well-established principles of landlord-tenant law. See, e.g., 65 Ohio Jurisprudence 3d (1996) 276, Landlord and Tenant, Section 271 (the sublessee cannot maintain an action against the original lessor upon the original lease); 3 McDermott, Ohio Real Property

{¶ 20} Festival does not contest the general application of these principles but instead attempts to circumvent them. First, Festival contends that contracting parties can alter the general rules of contract law in their agreements and that this is precisely what was done in the lease and the sublease. Second, Festival argues that it was a third-party beneficiary of the original lease and should be permitted to enforce its terms against the successor in interest to the original lessor (New Plan). We are not persuaded by these contentions.

{¶ 21} To begin, Festival cites no authority in its brief, and we have found none in our own research, in which a court has ever held that an original lessor could alter the fundamental rules of privity of contract and be held liable to a sublessee on covenants in an original lease. Moreover, we believe several important reasons explain why we should not adopt that position.

{¶ 22} First, if the successor in interest to the original lessor was made liable to the sublessee, then reciprocal liability must also be extended to the sublessee (e.g., for rent payments). The lessor may arguably agree in the original lease to bind itself to a future sublessee, but there is no conceivable way that a future sublessee (who is not even involved in the original transaction) could possibly agree to bind itself to the original lessor. Second, contractual privity goes to the very heart of actionable breach and is a fundamental principle of contract law.[9] Privity of contract between parties, including lessors and lessees, is a fundamental prerequisite to bringing suit for the breach of a contract and we do not believe that the parties in the instant case could alter those principles in the lease agreement.

---

Law (1966) 55, Section 18–43A (neither privity of estate nor privity of contract exists between the lessor and the sublessee and, hence, the sublessee cannot enforce the lessor's covenants); 49 American Jurisprudence 2d (1995) 919, Landlord and Tenant, Section 1183 (as between the original lessor and the sublessee, there is no privity of contract or estate and therefore the sublessee does not acquire any rights to enforce the covenants or agreements of the lessor contained in the original lease); 1 Taylor, Landlord and Tenant (9th Ed.1904) 130, Section 109 (as no privity of contract exists between an under-lessee and the original lessor, the covenants between the latter and the original lessee do not effect the under-lessee); 1 McAdam, Landlord and Tenant (5th Ed.1934) 249, Section 70 (there is no privity of contract between the paramount landlord and the sublessee and neither can sue the other for breach of the original lease).

9. See *Mahalsky v. Salem Tool Co.* (C.A.6, 1972), 461 F.2d 581, 584 (Ohio law recognizes no action for breach of contract absent privity); see, also, *Cincinnati, Hamilton & Dayton RR. Co. v. Metro. Natl. Bank* (1896), 54 Ohio St. 60, 68, 42 N.E. 700 (there can be no cause of action upon a contract unless there is privity of contract between the obligor and the party complaining); *Vought v. Columbus, Hocking Valley & Athens RR. Co.* (1898), 58 Ohio St. 123, 50 N.E. 442, at paragraph two of the syllabus (a party cannot, for his own benefit, insist upon the performance of a contract between others to which he is not a party or privy).

{¶ 23} Festival's third-party beneficiary argument is equally unavailing.[10] As a general proposition, a third party for whose benefit a contract has been entered may bring an action for a breach of that contract. See *Grant Thornton v. Windsor House, Inc.* (1991), 57 Ohio St.3d 158, 161, 566·N.E.2d 1220; *Rhorbacker v. Citizens Bldg. Assn. Co.* (1941), 138 Ohio St. 273, 276, 20 O.O. 336, 34 N.E.2d 751; *Thompson v. Thompson* (1854), 4 Ohio St. 333, 1854 WL 82, at paragraph six of the syllabus. However, only an *intended* third-party beneficiary may exert rights to a contract to which it is not a party. *TRINOVA Corp. v. Pilkington Bros., P.L.C.* (1994), 70 Ohio St.3d 271, 277, 638 N.E.2d 572. There are three categories of intended third-party beneficiaries: (1) a creditor beneficiary; (2) a donee beneficiary; and (3) an incidental beneficiary. *Visintine & Co. v. New York, Chicago & St. Louis RR. Co.* (1959), 169 Ohio St. 505, 507, 9 O.O.2d 4, 160 N.E.2d 311; see, also, *Hill v. Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St.3d 36, 40, 521 N.E.2d 780. Only the first two categories, however, may bring an action as a third-party beneficiary. An incidental beneficiary under a contract to which he is not a party cannot recover from the promisor in breach. *Visintine & Co.*, supra, 169 Ohio St. at 507, 9 O.O.2d 4, 160 N.E.2d 311; *Hill*, supra, 36 Ohio St.3d at 41, 521 N.E.2d 780; see, also, *Cullen v. Ohio Dept. of Rehab. & Corr.* (1998), 125 Ohio App.3d 758, 766, 709 N.E.2d 583; *Doe v. Adkins* (1996), 110 Ohio App.3d 427, 436, 674 N.E.2d 731.

{¶ 24} Festival does not argue that it is either a creditor beneficiary or a donee beneficiary and, from our review of the record, we do not believe that it falls under either category. A party is a "creditor beneficiary" if the performance of the promise satisfies a duty owed by the promisee to the beneficiary. *Visintine & Co.*, supra, 169 Ohio St. at 507, 9 O.O.2d 4, 160 N.E.2d 311; *Hill*, supra, 36 Ohio St.3d at 40, 521 N.E.2d 780. We have found nothing in the record to suggest that Scrivner owed a debt or other such "duty" to Festival when it entered the original lease. Indeed, the fact that the sublease provides for rental payments in exchange for subletting the premises tends to indicate that the sublease was intended purely as a business transaction and was not intended to discharge any obligation owed to the sublessee.

{¶ 25} By contrast, a party is a "donee beneficiary" if performance of the promise is meant to bestow some gratuitous benefit rather than to satisfy a legal obligation. 18 Ohio Jurisprudence 3d (2001) 46–47, Contracts, Section 149; see, also, 4 Corbin, Contracts (1951) 76–77, Section 782. Here again, we find nothing in the record to suggest that Scrivner intended to bestow a gratuitous

---

10. Here again, as with its argument that contracting parties can circumvent privity requirements in lease agreements, Festival Foods cites no authority, and we have found none in our research, to establish third-party beneficiary principles have been applied to allow a sublessee to recover from an original lessor for the breach of a lease agreement.

benefit on a subsequent sublessee. The provisions of the sublease relating to the payment of rent belie any contention that a gift formed the basis of this transaction.

{¶ 26} For these reasons, we find no merit to Festival's arguments as to why the fundamental rules regarding the lack of privity of contract between lessors and sublessees should not apply in the case sub judice. We thus agree with the trial court that Festival could not maintain an action in breach against New Plan. Festival counters that if it cannot maintain an action against New Plan, it would be left "with no rights of recourse in the event of a breach." As we noted previously, however, any recourse by sublessees must be against their sublessor—the original lessee. *Coffman,* supra, 13 Ohio Misc. at 128, 42 O.O.2d 169, 232 N.E.2d 676.[11]

{¶ 27} In any event, for the reasons stated above, we find no merit in Festival's fourth and fifth assignments of error, and they are, accordingly, overruled. Festival's remaining assignments of error all go to the merits of its claims against New Plan or the merits of New Plan's defenses to those claims. In light of our agreement with the trial court that Festival cannot maintain an action for breach against New Plan, these assignments of error have been rendered moot and will be disregarded pursuant to App.R. 12(A)(1)(c).

### III

{¶ 28} We now turn our attention to Fleming's first assignment of error wherein it asserts that the trial court erred by granting summary judgment in favor of New Plan. At the heart of this assignment of error is the question of what interpretation should be given to the original lease provision that prohibits the lessor from leasing space in the shopping center to any store that sells "groceries, meats, poultry, seafood, dairy products, fruits, vegetables or baked goods." Based upon the evidence of the parties' prior actions or inactions,[12] together with deposition testimony to establish the parties' original intent,[13] the trial court interpreted this provision as solely prohibiting the lessor from leasing

---

11. One of the claims in Festival's original complaint was against the successor in interest to its sublessor (Fleming) for the breach of its obligation to prohibit Wal–Mart from selling foodstuffs. The trial court dismissed that claim and Festival has not appealed that portion of the court's judgment.

12. The court noted that Fleming and Festival did not object to food sales by Wal–Mart in the "estoppel letter" of 1992, the "estoppel certificate" of 1993, or in any of its internal documents.

13. The court cited testimony from Louise McFall and C.W. Ansell to the effect that the parties intended to have only one supermarket in the shopping center but several "anchor stores" that would, incidentally, sell food items.

space to "other supermarkets" or "store[s] primarily engaged in the sale of foodstuffs." Thus, because Wal–Mart is not a supermarket primarily engaged in the sale of foodstuffs, the trial court concluded that New Plan's predecessor in interest did not violate the terms of the lease by leasing space to Wal–Mart. Fleming argues that the trial court erred in giving this interpretation to the lease. We agree.

{¶ 29} Our analysis begins from the basic premise that leases are contracts and are subject to the traditional rules of contract interpretation. See *Christe v. GMS Mgt. Co.* (1997), 124 Ohio App.3d 84, 88, 705 N.E.2d 691; *Frenchtown Square Partnership v. Lemstone, Inc.* (May 10, 2001), Mahoning App. No. 99CA300, 2001 WL 503068; *Hamilton v. Briede* (Apr. 21, 1997), Butler App. No. CA96–11–227, 1997 WL 194896. The cardinal purpose in construing contracts is to ascertain and give effect to the parties' intention. *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.* (1999), 86 Ohio St.3d 270, 273, 714 N.E.2d 898; *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920; *Skivolocki v. E. Ohio Gas Co.* (1974), 38 Ohio St.2d 244, 67 O.O.2d 321, 313 N.E.2d 374, at paragraph one of the syllabus. The intent of the parties to a contact is presumed to reside in the language they choose to employ in that agreement. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 361, 678 N.E.2d 519; *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, at paragraph one of the syllabus; *Blosser v. Enderlin* (1925), 113 Ohio St. 121, 148 N.E. 393, at paragraph one of the syllabus. Common words used in a written instrument will be given their ordinary meaning unless (1) manifest absurdity results, or (2) some other meaning is clearly evidenced from the instrument. *Foster Wheeler*, supra, 78 Ohio St.3d at 361, 678 N.E.2d 519; *Chicago Title Ins. Co. v. Huntington Natl. Bank* (1999), 87 Ohio St.3d 270, 273, 719 N.E.2d 955; *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, at paragraph two of the syllabus. We also note that the interpretation of written contracts is a question of law that, unlike issues of fact that are afforded great deference, is reviewed on appeal de novo. *Alexander*, supra, at paragraph one of the syllabus; *Lovewell v. Physicians Ins. Co. of Ohio* (1997), 79 Ohio St.3d 143, 144, 679 N.E.2d 1119; *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949.

{¶ 30} The exclusive-use provision of the lease in the instant case states that the lessor shall not, without prior written consent of the lessee, grant a lease in the shopping center that permits a tenant to sell, or offer to sell, "groceries, meats, poultry, seafood, dairy products, fruits, vegetables or baked goods * * *." These prohibited items are not defined in the lease, but we believe their meaning is clear enough. "Groceries" are the commodities sold by a "grocer," who is one

who sells foodstuffs and various household supplies. American Heritage Dictionary (2d Ed.1985) 577. Meats, poultry, seafood, dairy products, fruits, and vegetables are self-explanatory. We have found no definition for "baked goods" per se, but "baked" means to cook in an oven, id. at 152, and "goods" are defined as "commodities," id. at 587, which are articles of trade or commerce—i.e., they may be sold. Id. Thus, "baked goods" are food items that are baked in an oven and placed for sale.

{¶ 31} The trial court construed these words to mean that the contracting parties meant to exclude only "supermarkets" or other "stores primarily engaged in the sale of foodstuffs." We disagree with that construction for several reasons. First, the word "supermarket" or the phrase "primarily engaged in the sale of foodstuffs" do not appear in the exclusive-use provision of the lease. Courts should refrain from reading terms into instruments when these terms do not otherwise exist. *Stotridge v. Admr.* (June 3, 1992), Pickaway App. No. 91CA18, 1992 WL 126232 (Stephenson, P.J., dissenting). Second, we believe that the trial court's interpretation of the contract language is too restrictive. If the lease provision prohibited only the sale of "groceries," then we might agree that the provision could either be construed as meaning "supermarket" or that the term is sufficiently ambiguous to warrant consideration of parol evidence. We note that no case law in Ohio appears to define the term "groceries," but other jurisdictions have, at times, struggled with what is encompassed by that term.[14] Be that as it may, the lease provision at issue here specifies more than just "groceries." It also states that the lessor shall not lease premises to any store that sells "meats, poultry, seafood, dairy products, fruits, vegetables or

---

14. Courts in California have held that the term "groceries" is sufficiently vague to allow introduction of parol evidence to show whether parties intended to permit the sale of beer in a store, see *Purity Stores, Ltd. v. Linda Mar Shopping Ctr., Inc.* (1960), 177 Cal.App.2d 568, 2 Cal.Rptr. 397, 399–400, but have also held that the sale of items such as toothpaste, shampoo, soap, etc., was outside the definition of "foodstuffs" normally associated with the term "groceries." See *Hildebrand v. Stonecrest Corp.* (1959), 174 Cal.App.2d 158, 344 P.2d 378, 385. Nevertheless, as noted by the court in *Purity Stores, supra,* 177 Cal.App.2d 568, 2 Cal.Rptr. at 400, traditional grocery stores have now become "supermarkets." In *Darby v. Pennsylvania Pub. Util. Comm.* (1959), 189 Pa.Super. 312, 150 A.2d 378, 380, the court adopted the definition of "groceries" promulgated by the Interstate Commerce Commission as being "articles for human consumption" and "articles used in the preparation of food," Id., 189 Pa.Super. 312, 150 A.2d at 380, citing *Scott Truck Line, Inc. v. United States* (D.C.Colo. 1958), 163 F.Supp. 118, 121; *Bird Trucking Co. v. United States* (D.C.Wis.1955), 159 F.Supp. 717, 719–721. More recently, a Florida court ruled that "groceries" are articles of food and other goods sold by a "grocer," which was defined as a dealer in staple food stuffs and household supplies. *Winn–Dixie Stores, Inc. v. 99 Cent Stuff* (Fla.App.2002), 811 So.2d 719, 722. The court noted that today, groceries include more than just food. These cases all appear to support the trial court's decision that "groceries" include "supermarkets." However, as noted above, the lease provision specifies more than just "groceries" and refers to sale of other specific food items as well.

baked goods * * *." This language indicates that the parties meant to prohibit not just the sale of "groceries" by supermarkets but also the sale of other specified items by any type of store. For instance, pursuant to the lease, "baked goods" could not be sold by any store, whether that store is a "supermarket" or is another type of store. Had the parties to the lease simply meant to exclude supermarkets, they could have used either that specific term or they could have expressly stated that no other store in the shopping center could sell "groceries." They would not have inserted a litany of other prohibited items. Moreover, by interpreting the exclusive-use provision as prohibiting other supermarkets, we would be forced to ignore the express language of the lease that prohibits any store from selling "meats, poultry, seafood, dairy products, fruits, vegetables or baked goods."

{¶ 32} Our third reason for our disagreement with the trial court's interpretation is that the court impermissibly based its decision on extrinsic evidence outside the four corners of the lease. The trial court considered (1) the parties' actions, or inactions, with regard to subsequent estoppel letters and (2) deposition testimony by several individuals as to the original intent of the parties in entering the lease agreement. We believe that the first category of evidence was improper. Action or inaction of parties subsequent to execution of the lease agreement may go to the issue of waiver or estoppel to assert a breach of that agreement, but we fail to see how it would have any bearing on the parties' original intent in entering the lease.

{¶ 33} We also believe that the trial court erred when it considered deposition testimony regarding the parties' original intent in entering the lease. When a contract is unambiguous, intentions not expressed by writing in the contract are deemed to have no existence and cannot be shown by parol evidence. See *TRINOVA Corp.*, supra, 10 Ohio St.3d at 275, 638 N.E.2d 572; *Aultman Hosp. Assn.*, supra, 46 Ohio St.3d at 53, 544 N.E.2d 920; *Charles A. Burton, Inc. v. Durkee* (1952), 158 Ohio St. 313, 49 O.O. 174, 109 N.E.2d 265, at paragraph two of the syllabus. Thus, extrinsic evidence is admissible to ascertain intent only when the contract is unclear or ambiguous, or when the circumstances surrounding it give the plain language special meaning. *Kelly*, supra, 31 Ohio St.3d at 132, 31 OBR 289, 509 N.E.2d 411; *Graham*, supra, 76 Ohio St.3d at 313–314, 667 N.E.2d 949; *Shifrin v. Forest City Ent., Inc.* (1992), 64 Ohio St.3d 635, 638, 597 N.E.2d 499. As we noted previously, we believe that the language of the exclusive-use provision in the lease is clear and unambiguous and should have been afforded its plain and ordinary meaning. Thus, we do not believe that the trial court should have resorted to extrinsic evidence to ascertain the parties' intent.

{¶ 34} Having concluded that the exclusive-use provision of the lease has a broader meaning than was afforded to it by the trial court, we must now address whether that provision amounted to an illegal restraint of trade in violation of R.C. Chapter 1331. New Plan argued below that if the exclusive-use provision was given its literal meaning, then it would violate state restraint-of-trade laws. The trial court essentially ruled in its March 9, 2001 judgment that the law was not violated because the lease provision prevented letting space only to "supermarkets" or to "store[s] primarily engaged in the sale of foodstuffs." Now that we have given the provision a more expansive reading, consistent with the terminology used therein, it is necessary to revisit the issue of state restraint-of-trade laws.

{¶ 35} Our analysis begins with R.C. 1331.06, which provides that any contract in violation of provisions in that chapter is null and void. R.C. 1331.01(B)(6) specifies that a "trust" is unlawful. A "trust" is defined, inter alia, as a combination by two or more persons to carry out restrictions in either trade or commerce or to prevent competition in the sale of produce or commodities. Id. at (B)(1) and (3). The gist of New Plan's argument is that by virtue of the exclusive-use provision in the lease, NBDC (its predecessor in interest) and Scrivner (Fleming's predecessor in interest) combined to form an illegal "trust" in restraint of trade. We disagree.

{¶ 36} The Ohio Supreme Court recognized years ago that if antitrust laws were construed literally or strictly, no partnership could be formed, no corporation could be organized, no vendor could agree to a reasonable limitation upon his future business, and scores of other activities that have been permitted and approved of in this country for centuries would be banned. See *List v. Burley Tobacco Growers' Co–Operative Assn.* (1926), 114 Ohio St. 361, 377, 151 N.E. 471. Thus, the court held that contracts in restraint of trade are not illegal unless they are unreasonable. Id. at paragraph four of the syllabus; see, also, *Potters Med. Ctr., Inc. v. Ratchford* (1985), 18 Ohio St.3d 253, 255, 18 OBR 309, 480 N.E.2d 789; *Stark Cty. Milk Producers' Assn. v. Tabeling* (1934), 129 Ohio St. 159, 166, 1 O.O. 472, 194 N.E. 16.

{¶ 37} In *C.K. & J.K., Inc. v. Fairview Shopping Ctr.* (1980), 63 Ohio St.2d 201, 17 O.O.3d 124, 407 N.E.2d 507, at paragraph one of the syllabus, the Ohio Supreme Court held that a provision in a shopping-center lease granting a lessee the exclusive right to carry on a certain line of business in the shopping center does not constitute an illegal restraint of trade under R.C. Chapter 1331 as long as the scope and effect of the grant is not unreasonably broad. The exclusive-use provision in that case involved restricting the sale of liquor, alcoholic beverages, wines, and beer by the glass but, because it did not affect the whole community

and did not extend beyond the shopping center, the court found that the provision was not unreasonably broad. Id. at 206, 17 O.O.3d 124, 407 N.E.2d 507.

{¶ 38} Similarly, in the instant case, the restrictive-use provision prohibits stores only from selling groceries and other specified food items in the shopping center. It did not affect the rest of the New Boston community and, thus, appears to pass muster under *C.K. & J.K., Inc.* Moreover, we believe that the exclusive-use provision satisfies other criteria adopted by courts to determine whether such provisions are reasonable. For example, the federal District Court for the Southern District of Ohio has opined that the factors to examine when determining whether an exclusive-use provision is overbroad are (1) the relevant product and geographic markets, together with the showing of unreasonable impact upon competition in these markets due to the restrictive covenant; (2) the availability of alternate sites for the entity excluded by the operation of such covenant; (3) the significance of competition eliminated by the exclusivity clause, and whether present or future competitors were the parties excluded; (4) the scope of the restrictive covenant and whether it varies depending on the circumstances; and (5) the economic justifications for including the restrictive covenant in the lease. *Child World, Inc. v. S. Towne Centre, Ltd.* (D.C.Ohio 1986), 634 F.Supp. 1121, 1130–1131.[15]

{¶ 39} Weighing these factors in light of the evidentiary materials submitted below, we are not persuaded that the exclusive-use provision constitutes an unreasonable restraint of trade. As noted previously, this provision pertains only to tenants within that particular shopping center. It does not affect the rest of the community. Our review of the record has found no evidence to suggest that this provision restricted entry of, or prohibited competition by, any grocer or seller of foodstuffs outside the shopping center and in the larger New Boston community. We emphasize that antitrust laws exist for the protection of competition, not competitors, *Acme Wrecking Co., Inc. v. O'Rourke Constr. Co.* (Mar. 1, 1995), Hamilton App. No. C–930856, 1995 WL 84188, and that the essence of competition is not within a shopping center but between shopping centers. *Carm's Foods, Inc. v. Fred W. Albrecht Grocery Co.* (May 14, 1984), Stark App. No. CA–6309, 1984 WL 7490.

{¶ 40} Therefore, New Plan has not carried its burden on summary judgment to establish that this particular provision works an illegal restraint of trade. For these reasons, we agree with the trial court and conclude, even under our more

15. Ohio's restraint-of-trade statutes are patterned after the Sherman Anti–Trust Act and, as a consequence, courts in this state have interpreted Ohio law in light of the interpretation of the Sherman Act. *C.K. & J.K., Inc. v. Fairview Shopping Ctr.* (1980), 63 Ohio St.2d 201, 204, 17 O.O.3d 124, 407 N.E.2d 507. Thus, it is appropriate to turn to federal case law for guidance in determining the reasonableness of these provisions.

expansive reading of the exclusive-use provision, that the lease does not violate R.C. Chapter 1331.

{¶ 41} Having concluded that the lease's exclusive-use provision precludes more than simply supermarkets or stores engaged primarily in the sale of foodstuffs, and having found that such provision does not constitute an illegal restraint of trade in violation of R.C. Chapter 1331, we need to apply the plain language of the lease to determine only whether New Plan breached its covenants. We believe that the evidentiary materials submitted below establish that it did.

{¶ 42} In support of its motion for summary judgment, Fleming introduced a copy of the lease between NBDC and Wal–Mart. Fleming contends, and our review of that document bears out this contention, that nothing in that lease prohibits Wal–Mart from selling any of the items mentioned in the lease to Fleming's predecessor in interest. Moreover, the evidentiary materials reveal that Wal–Mart actually sold those items. Photographs included in the exhibits to support New Plan's motion for summary judgment show dairy products, cookies ("baked goods"), and other grocery-type items being sold at Wal–Mart. In light of these photographs, as well as other evidence in the record and New Plan's concession in its motion for summary judgment that Wal–Mart sold various "food" items, we believe that New Plan violated the lease to Fleming.

{¶ 43} For these reasons, we agree with Fleming that the trial court erred in granting summary judgment to New Plan. Accordingly, its first assignment of error is well taken and is hereby sustained.

## IV

{¶ 44} We now turn to Fleming's second assignment of error and argument that the trial court erred by overruling its motion for summary judgment against New Plan. The basis for this argument is that the lease's exclusive-use provision clearly and unambiguously restricted leasing space in the shopping center to any store without prohibiting that store from selling the items set forth in the lease provision. Because Wal–Mart leased space without any restrictions on the items that it could sell, and because Wal–Mart actually sold items that it should have been prohibited from selling, Fleming contends that New Plan breached the lease and that judgment should have been entered against it as a matter of law. Although we agree with Fleming's interpretation of the exclusive-use provision, for the following reasons we disagree with its conclusion that it was automatically entitled to judgment against New Plan.

{¶ 45} In response to Fleming's cross-claim, New Plan asserted a variety of defenses, including estoppel. Part of this defense involved the use of a so-called

"estoppel" letter and "estoppel" certificate. The "estoppel letter" was dated November 23, 1992, and represented, inter alia, that, as of that date, no "defaults under the terms of the lease" had occurred between NBDC and its lessee and sublessee (Scrivner and Festival). That letter stated, however, that it would be "void and of no effect" if it was not executed by all parties thereto. It is undisputed that the letter was not executed by New Plan and, hence, by its terms, the letter is void and of no effect.

{¶ 46} On January 28, 1993, Scrivner and Festival tendered to New Plan an "Updated Tenant Estoppel Certificate." The gist of this estoppel certificate, which had an attached copy of the November 1992 estoppel letter, was that the "representations and warranties" made in the attached letter would be "binding" on Scrivner and Festival Foods and enure to the benefit of New Plan.

{¶ 47} In ruling on the motions for summary judgment, the trial court held that New Plan could not rely on the November estoppel letter in support of its estoppel defense because that letter was not executed pursuant to its terms. The January estoppel certificate, however, was properly executed, and the court held that this constituted some evidence to support New Plan's defense. The trial court concluded that a genuine issue of material fact remained as to whether New Plan justifiably relied on the estoppel certificate and, thus, Fleming was not entitled to summary judgment in its favor as a matter of law.[16] Fleming argues on appeal that New Plan could not rely on either the estoppel letter or the estoppel certificate and that the trial court should have granted it summary judgment on its claim. We are not persuaded.

{¶ 48} New Plan asserted in its answer that Fleming's claim against it was barred by the doctrine of estoppel, not by the estoppel letter and estoppel certificate. Although those documents have considerable bearing on whether estoppel may apply, they are not completely dispositive. Before we discuss the specifics of the estoppel letter and certificate, however, we must address the issue of estoppel in general. For the following reasons, we do not believe that Fleming carried its initial burden on summary judgment with respect to that issue. As we mentioned previously, the party moving for summary judgment has the initial burden to show that no genuine issues of material fact exist (either with respect to its claims or with respect to any defenses to those claims) and that it is entitled to judgment in its favor as a matter of law. In the case sub judice, we note that Fleming's motion for summary judgment barely addressed the estoppel issue and

---

16. Of course, the primary reason for denying Fleming's motion for summary judgment was the court's conclusion that the exclusive-use provision in the lease did not bar Wal–Mart from selling those items specified in the lease provision.

did not address several of the elements necessary to negate the use of that defense by New Plan.

{¶ 49} We note at the outset that "estoppel" is a term that parties frequently use quite loosely. *In re Estate of Cecere* (1968), 17 Ohio Misc. 101, 104, 46 O.O.2d 134, 242 N.E.2d 701. In its broadest sense, "estoppel" is a bar that precludes a person from denying a fact that has become settled by an act of the person himself. See *Sanborn v. Sanborn* (1922), 106 Ohio St. 641, 647, 140 N.E. 407. There are three broad categories of estoppel, namely (1) estoppel by record; (2) estoppel by deed; and (3) estoppel in pais ("equitable estoppel"). 42 Ohio Jurisprudence 3d (1983) 8, Estoppel and Waiver, Section 2. New Plan did not expressly state in its answer what type of estoppel it was invoking but, after reviewing the arguments raised in its motions below and its briefs on appeal, we conclude that New Plan raised "equitable estoppel."

{¶ 50} The purpose of equitable estoppel is to prevent fraud and to promote the interests of justice. *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630; see, also, *Goldauskas v. Elyria Foundry Co.* (2001), 145 Ohio App.3d 490, 495, 763 N.E.2d 645; *Helman v. EPL Prolong, Inc.* (2000), 139 Ohio App.3d 231, 246, 743 N.E.2d 484. Equitable estoppel arises when one party induces another party to believe that certain facts exist and the other party changes his position to his detriment in reasonable reliance on those facts. *Chubb v. Ohio Bur. of Workers' Comp* (1998), 81 Ohio St.3d 275, 279, 690 N.E.2d 1267; *State ex rel. Chavis v. Sycamore City School Dist. Bd. of Edn.* (1994), 71 Ohio St.3d 26, 34, 641 N.E.2d 188; *Ensel v. Levy* (1889), 46 Ohio St. 255, 19 N.E. 597, at the syllabus. To invoke the doctrine of equitable estoppel, a party must demonstrate (1) a factual misrepresentation; (2) that is misleading; (3) that induced actual reliance, which was both reasonable and in good faith; and (4) that caused detriment to the relying party. *Hoeppner v. Jess Howard Elec. Co.*, 150 Ohio App.3d 216, 2002-Ohio-6167, 780 N.E.2d 290, at ¶ 43; *Myers v. Myers*, 147 Ohio App.3d 85, 2002-Ohio-405, 768 N.E.2d 1201, ¶ 30; *Gruber v. Kopf Bldrs., Inc.*, 147 Ohio App.3d 305, 2001-Ohio-4361, 770 N.E.2d 598, ¶ 23.

{¶ 51} From our review of Fleming's summary judgment motion and the supporting evidentiary materials, it does not appear that Fleming sufficiently negated the elements of New Plan's estoppel defense. There is little or nothing in the motion to show the absence of a misleading factual representation. Fleming argued in its motion that "[t]he representations within the Estoppel Letter are limited to Fleming's actual knowledge," which suggests the lack of a knowing factual misrepresentation. But Fleming cites no evidentiary materials to support that contention. Moreover, there does not appear to be any qualification of that sort in either the estoppel letter or the estoppel certificate.

{¶ 52} Assuming arguendo that Fleming did carry its initial burden on this issue, New Plan adduced evidence in rebuttal to show that Fleming was aware of the breach but purposely misrepresented in the estoppel letter and certificate that no breach existed. New Plan cited deposition testimony by Dan Slade, expert counsel retained by Festival Foods, to the effect that representatives who signed the documents knew that the "certifications and representations they were making * * * were false[.]" Thus, genuine issues of material fact exist with regard to whether Fleming made false and misleading factual representations to New Plan.

{¶ 53} That aside, we also agree with the trial court's conclusion that genuine issues of material fact exist regarding whether New Plan could reasonably rely upon representations made by Fleming's predecessor in interest. The 1993 estoppel certificate incorporated the previous estoppel letter, which provided that there were "no defaults under the terms of the lease" and represented that New Plan could "rely" on that representation. New Plan submitted evidence below to the effect that it relied on that representation when it acquired the shopping center from NBDC. Given the fact that Fleming is a large and sophisticated corporation, and considering that it purposely represented to New Plan the absence· of defaults under the terms of the lease and that New Plan could rely on those representations, we agree that sufficient evidence of reasonable reliance exists to survive a motion for summary judgment.

{¶ 54} Fleming counterargues in its brief that because the 1992 estoppel letter is "void" for the failure of New Plan to execute it, and because the 1993 estoppel certificate incorporates the 1992 letter, the subsequent certificate must also be void. We are not persuaded. We need not engage in a lengthy discussion of whether the incorporation of the void estoppel letter into the subsequent certificate renders the certificate void. Even if the subsequent estoppel certificate is void, neither the estoppel letter nor the estoppel certificate is a "magic bullet" that proves or disproves equitable estoppel. These exhibits are merely some evidence of that defense.[17] Whether the terms of the certificate

17. Estoppel certificates are broadly defined as "[a] signed statement by a party, such as a tenant * * * certifying for the benefit of another party that a certain statement of fact is correct as of the date of the statement, such as * *.* that there are no defaults * * *." Black's Law Dictionary (5th Ed.1979) 495. Ohio courts have noted that estoppel certificates are useful devices to preserve and enhance the marketability of commercial property, *Freshman v. Attaboy Manufacturers' Rep., Inc.* (Feb. 2, 1993), Franklin App. No. 92AP–638, 1993 WL 20061, and are commonly used by landlords in financial transactions. *Katz v. M.M.B. Co.* (May 8, 1986), Cuyahoga App. No. 50579, 1986 WL 5298. Nevertheless, the use of such instruments does not replace the common-law defense of equitable estoppel. Thus, when an estoppel certificate fails for one reason or another, the party may still rely on the common-law defense of equitable estoppel. In other words, even if the estoppel letter and certificate at

fail due to a technicality in its execution is largely irrelevant because it was still represented to New Plan that no default occurred under the lease and that New Plan could rely on that representation. A failure to properly execute the estoppel letter or the certificate may be considered by the trier of fact in determining reasonable reliance, but it does not change the fact that such representations were made.

{¶ 55} Fleming also contends that New Plan could not rely on these documents as a matter of law because it already had notice of the breach of lease at the time it sent the estoppel letter and certificate.[18] Although Fleming refers to evidence in the record to support its contention that New Plan had notice of the breach, we believe that this is an issue that is best left to be determined by the trier of fact.

{¶ 56} Even assuming arguendo that New Plan did have notice of the breach before receiving the estoppel letter and certificate, and hence could not show reasonable reliance thereon to prove its defense of equitable estoppel, Fleming still has another hurdle before it would be entitled to summary judgment. New Plan also asserted in its answer to Fleming's cross-claim the defense of "waiver." Waiver is a vague term used for a great variety of purposes, 42 Ohio Jurisprudence 3d, supra, at 155, Section 93, and, as with its claim of equitable estoppel, New Plan is somewhat vague as to how it intends to apply that defense in this case.

{¶ 57} Generally speaking, waiver is the voluntary relinquishment of a known right. *State ex rel. Wallace v. State Med. Bd. of Ohio* (2000), 89 Ohio St.3d 431, 435, 732 N.E.2d 960; *White Co. v. Canton Transp. Co.* (1936), 131 Ohio St. 190, 5 O.O. 548, 2 N.E.2d 501, at paragraph one of the syllabus; *Michigan Auto. Ins. Co. v. Van Buskirk* (1927), 115 Ohio St. 598, 155 N.E. 186, at paragraph one of the syllabus. A "waiver" can be found in a great variety of circumstances. For example, "waiver by estoppel" exists when the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop the party

---

issue herein are void, New Plan can still avail itself of the doctrine of equitable estoppel and it is up to Fleming, as the party moving for summary judgment, to demonstrate that no genuine issues of material fact exist with respect to that defense and that it was entitled to judgment in its favor as a matter of law.

18. Fleming cites *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630, wherein the Ohio Supreme Court held that, to invoke equitable estoppel, a party's reliance on conduct of another must be reasonable "in that the party claiming estoppel *did not know and could not have known that its adversary's conduct was misleading.*" (Emphasis added.) Because New Plan allegedly knew about the breach of lease before it received the estoppel letter and estoppel certificate, Fleming contends that it cannot show reasonable reliance on those documents and, hence, cannot prove equitable estoppel.

having the right from insisting upon it. See *Motz v. Root* (1934), 53 Ohio App. 375, 376–377, 7 O.O. 174, 4 N.E.2d 990. We also note that the waiver of contractual rights typically requires consideration unless the actions of the party making the waiver are such that he must be estopped from insisting upon the right claimed to have been relinquished. *Marfield v. Cincinnati, D. & T. Traction Co.* (1924), 111 Ohio St. 139, 145, 144 N.E. 689. A waiver may be enforced by anyone having a duty to perform, but who has changed his or her position as a result of the waiver. *Chubb*, supra, 81 Ohio St.3d at 279, 690 N.E.2d 1267; *Andrews v. Teachers Retirement Sys.* (1980), 62 Ohio St.2d 202, 205, 16 O.O.3d 240, 404 N.E.2d 747.

{¶ 58} Applying these principles to the instant case, and construing the evidence adduced below in a light most favorable to New Plan as the nonmoving party, we conclude that genuine issues of material fact exist as to whether Fleming's predecessor in interest waived its right to claim a breach. New Plan may well have known about the breach prior to receiving the estoppel letter and estoppel certificate, and may well have negated any claim to the defense of equitable estoppel. However, this does not relieve Fleming of the responsibility for the actions of its predecessor in interest. If Scrivner knew of the breach, and apparently there is evidence in the record to suggest that it did, but represented to New Plan that no breach had occurred and allowed New Plan to acquire the shopping center, in part, on the assumption that it would not bring any claim for breach of the lease, this could constitute a waiver of its rights. Again, this issue is best left for final determination by the trier of fact. For all these reasons, we find that genuine issues of material fact exist regarding New Plan's defense of equitable estoppel and waiver. Thus, the trial court did not err in refusing to grant Fleming's motion for summary judgment on its claims against New Plan. Thus, Fleming's second assignment of error is without merit and is hereby overruled.

V

{¶ 59} Fleming argues in its third assignment of error that the trial court erred in the relief it awarded to New Plan for what the court deemed was Fleming's breach of the lease. In light of the fact that we have sustained its first assignment of error and that we have reversed the judgment for New Plan, this assignment of error is now rendered moot and will be disregarded pursuant to App.R. 12(A)(1)(c). We further note that by reversing summary judgment for New Plan, we also reverse the trial court's October 24, 2001 judgment granting New Plan back rent in the amount of $846,729.88, as well as its November 12, 2002 judgment granting New Plan restitution of the premises.

## VI

{¶ 60} We now turn to New Plan's first cross-assignment of error. New Plan argues that the trial court erred by not entering summary judgment in its favor on its cross-claim against Fleming. Specifically, New Plan argues that it was entitled to rely on the estoppel letter and the estoppel certificate as a matter of law and that Fleming is therefore estopped from asserting a breach of the lease. We reject this argument for many of the same reasons we rejected it when raised by Fleming.[19]

{¶ 61} New Plan introduced copies of both the estoppel letter and estoppel certificate below. Those documents show that Fleming represented that no breach of the lease had occurred. New Plan also pointed to Dan Slade's testimony that those documents were signed by representatives who knew the representations to be false. We conclude that this evidence constitutes sufficient evidence to establish a misleading representation. Because the estoppel certificate specified that those representations could be relied on by New Plan, we believe that evidence of reasonable reliance exists. There is also no question that if New Plan is found in breach of the lease, there was detrimental reliance. In short, we conclude that New Plan carried its initial burden on summary judgment to show that the principles of equitable estoppel apply here.

{¶ 62} By the same token, however, we believe that Fleming carried its burden of rebuttal to show that New Plan's reliance was not reasonable. Fleming points to evidence to suggest that New Plan knew of the breach of the exclusive-use provision in the lease when it examined the leases of the shopping center before acquiring it from NBDC. This raises genuine issues of material fact as to whether New Plan's reliance on representations made by Fleming was reasonable. For these reasons, we conclude that summary judgment for New Plan would have been improper here.

{¶ 63} We also parenthetically note that New Plan was not entitled to summary judgment on the basis of its waiver defense. Despite having previously held that the representations of Fleming's predecessor in interest may have constituted a waiver of its rights to sue for a breach of the lease, we also find that evidence was introduced below to show that Scrivner may not have been aware of the breach when it executed the estoppel letter and certificate. As mentioned previously, a waiver is the relinquishment of a known right. *State ex rel. Wallace,* supra, 89 Ohio St.3d at 435, 732 N.E.2d 960; *White Co.,* supra, at paragraph one of the syllabus. Thus, a party cannot be deemed to have waived a

---

19. Again, we emphasize that the issue here is not so much the effect of the estoppel letter and certificate as it is the applicability of the defense of equitable estoppel for which those documents are some evidence but are not necessarily conclusive.

right based on material facts the existence of which it did not know. *Michigan Auto Ins. Co.,* supra, at paragraph one of the syllabus; see, also, *In re Estate of Fetzer* (App.1954), 71 Ohio Law Abs. 275, 279, 130 N.E.2d 732; *Western & Southern Life Ins. Co. v. Bennett* (1933), 45 Ohio App. 498, 501, 187 N.E. 361. If Scrivner was not aware of the breach at the time it gave the estoppel letter and estoppel certificate, then it obviously cannot be said to have waived its right to enforce the breach. Once again, this is another issue best left to the trier of fact.

{¶ 64} In any event, for all of these reasons, we find no merit in New Plan's first cross-assignment of error, and it is hereby overruled.

## VII

{¶ 65} New Plan argues that the second assignment of error involves the rent-abatement provision in the lease agreement. Section 6.3 of the lease provides that, "[i]n the event of any violation of the terms of this [exclusive-use provision], all rental obligations under this Lease *shall be abated during the period of such violation,* and Lessee shall not be in default for failure to pay any rental allocated to such period." (Emphasis added.) This lease has an initial term of 20 years and, further provides for an automatic renewal for 6 additional terms of 5 years each unless the lessee chooses not to renew. Pursuant to Sections 2 and 26 of the lease between NBDC and Wal–Mart, the initial term of Wal–Mart's lease is 20 years and may be renewed at the option of the lessee for 6 more consecutive periods of 5 years each. Given the terms of these leases and the fact that the Wal–Mart lease was in violation of the exclusive-use provision of the lease to Fleming's predecessor in interest, the rent-abatement provision could conceivably allow for Fleming to remain as a tenant in the shopping center rent-free for several more decades before the Wal–Mart lease expires.

{¶ 66} New Plan argued below that the rent-abatement provision constituted an unenforceable penalty provision in the lease and should not be applied here. The trial court disagreed and held that the provision is an enforceable liquidated-damages clause. New Plan argues on appeal that this judgment is erroneous. We agree.

{¶ 67} Our analysis begins from the premise that Ohio law generally respects the freedom of contract. The right to contract freely with the expectation that the contract shall endure according to its terms is as fundamental to our society as the right to speak without restraint. *Nottingdale Homeowners' Assn., Inc. v. Darby* (1987), 33 Ohio St.3d 32, 36, 514 N.E.2d 702; *Blount v. Smith* (1967), 12 Ohio St.2d 41, 47, 41 O.O.2d 250, 231 N.E.2d 301; see, also, *Fodor v. First Natl. Supermarkets, Inc.* (1992), 63 Ohio St.3d 489, 493, 589 N.E.2d 17 (Douglas, J., concurring). In some circumstances, however, complete freedom of

contract is not permitted for public-policy reasons. *Fuschino v. Smith* (Jan. 5, 2001), Clark App. No. 2000–CA–31, 2001 WL 9928; *Boice v. Emshoff* (Dec. 3, 1998), Seneca App. No. 13–98–23, 1998 WL 833686; *Tremco, Inc. v. Kent* (May 29, 1997), Cuyahoga App. No. 70920, 1997 WL 284744. One such reason is that the law generally disfavors penalty provisions for breaches of contract. While parties may insert into their contract a clause that apportions damages in the event of a default (a liquidated-damages clause), they may not agree to a provision that operates as a penalty and punishes a party for breach. See *DeCastro v. Wellston City School Dist. Bd. of Edn.* (2002), 94 Ohio St.3d 197, 201, 761 N.E.2d 612; *Lake Ridge Academy v. Carney* (1993), 66 Ohio St.3d 376, 381, 613 N.E.2d 183.

{¶ 68} Deciding whether a contract provision is a valid liquidated-damages clause or an unenforceable penalty is difficult. The Ohio Supreme Court held that the following test should be applied in making that determination: "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." *Lake Ridge Academy,* supra, 66 Ohio St.3d at 382, 613 N.E.2d 183; see, also, *Samson Sales, Inc. v. Honeywell, Inc.* (1984), 12 Ohio St.3d 27, 12 OBR 23, 465 N.E.2d 392, at the syllabus; *Jones v. Stevens* (1925), 112 Ohio St. 43, 146 N.E. 894, at paragraph two of the syllabus.[20]

{¶ 69} We need not address the first and third criteria of this test in relation to the lease provision and issue in the case sub judice because we find that the rent-abatement clause renders the entire contract so unreasonable that it could not possibly have been within the contemplation of the parties. As stated previously, the rent-abatement clause provides for the abatement of Fleming's rent during the period of the violation. The lease under which Wal–Mart currently occupies the shopping center runs for a twenty-year term with the option to renew for 6

---

20. We note that the question of whether a contract clause is a liquidated-damages provision or a penalty is a question of law for trial courts and is reviewed on appeal de novo. See, e.g., *Westbrock v. W. Ohio Health Care Corp.* (2000), 137 Ohio App.3d 304, 321, 738 N.E.2d 799; *Courtad v. Winner,* Summit App. No. 20630, 2002-Ohio-2094, 2002 WL 971778, ¶ 19; *Republic–Franklin Ins. Co. v. GRG Trucking* (Dec. 13, 2001), Cuyahoga App. No. 79559, 2001 WL 1612092.

more periods of 5 years each. Essentially, this lease could run for a total of 50 years. Because there does not appear to be any mechanism to renegotiate the Wal–Mart lease, or any means by which New Plan could prevent Wal–Mart from selling the prohibited food items, the breach could conceivably continue for decades, during which time Fleming could remain in the shopping center rent-free. We believe that this is the type of draconian "penalty" clause meant to be prohibited under the aforementioned case law.

{¶ 70} Fleming counters that it "remains willing to pay rent and will do so when Wal–Mart's Lease is restricted as required by [Section] 6.3" of the lease. Thus, Fleming concludes, New Plan's "speculative argument" about it remaining in the shopping center "rent free for 40 years should be quickly dismissed." We are not persuaded.

{¶ 71} First, we have found nothing in the Wal–Mart lease to allow New Plan to "restrict" Wal–Mart's sale of these particular food items, and Fleming has not cited any. Second, even if Fleming remains "willing" to pay rent, notwithstanding the abatement clause, it arguably has no legal obligation to pay any rent (given the breach), and it requires a substantial leap of faith to conclude that it would do so simply out of its motive for fair play.[21]

{¶ 72} In any event, for these reasons we agree with New Plan that the rent-abatement clause constitutes an unenforceable penalty. This does not, however, mean that New Plan completely avoids all consequences for the breach. On remand, if New Plan cannot convince the trier of fact as to the merits of its estoppel and waiver defenses and thus is found in breach of the lease, then Fleming is entitled to recover whatever compensatory damages it can prove to have sustained as a result of the breach.[22] Therefore, New Plan's second cross-assignment of error is well taken and hereby sustained.

## VIII

{¶ 73} To summarize, we affirm the trial court's dismissal of the claims brought by Festival against New Plan. However, we sustain Fleming's first assignment of error on grounds that Section 6.3 of the lease was violated when space was leased

---

**21.** If Fleming is sincerely interested in remaining in the shopping center because, either under reduced rent or under some other change in circumstances, we encourage the parties to make a good-faith attempt to negotiate a settlement with New Plan on remand. We encourage New Plan to negotiate a settlement as well. There is nothing in this opinion that New Plan should misconstrue as excusing the breach of the lease with Fleming's predecessor in interest.

**22.** See *Everett v. Reece* (Feb. 24, 1989), Lucas App. No. L–88–060, 1989 WL 14745; *Mentor Lagoons, Inc. v. Laity* (May 24, 1985), Lake App. No. 10–184, 1985 WL 9999; see, also, 30 Ohio Jurisprudence 3d (1999) 147–148, Damages, Section 120; 22 American Jurisprudence 2d (1988) 781–782, Damages, Section 727.

to Wal–Mart without prohibiting Wal–Mart from selling the food items specified in the lease to Fleming's predecessor in interest. Whether that lease violation amounts to a breach will depend on whether the trier of fact accepts New Plan's estoppel and/or waiver defenses. If the trier of fact rejects them and finds that New Plan has breached the lease, it should then proceed to determine what compensatory damages are due to Fleming in light of our finding that the rent-abatement clause constitutes an unenforceable penalty pursuant to New Plan's second assignment of error.

{¶ 74} With all that in mind, the judgment of the trial court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part
and cause remanded.

EVANS, J., concurs.

KLINE, P.J., concurs in judgment only.