OPINION *Page 2 
{¶ 1} Appellant Palek Corp. appeals a judgment of the Mahoning County Court of Common Pleas in a civil case involving a contract dispute. Appellant was a subcontractor in a bridge renovation project being completed by Appellee A.P. O'Horo Co., the general contractor. Appellant began painting the steel components of the bridge, but encountered problems with concrete residue that had recently been deposited on the steel during the repair process. Appellant worked for eight days, completing 30% of the job, and then stopped. On or about the time Appellant stopped work, Appellee asked Appellant to produce a liability insurance certificate as required by the contract. Appellant did not provide the required insurance, and was soon replaced by another subcontractor. Appellant sued for breach of contract in the amount of $39,360. Appellee filed a counterclaim also alleging breach of contract but seeking the amount of $77,042.38. The trial court granted judgment to Appellee on the original complaint, and also judgment in the counterclaim, with an offset for the work that Appellant had completed, resulting in an award to Appellee of $28,130.62.
 {¶ 2} Appellant argues on appeal that Appellee waived the insurance requirement by waiting eight days after work had started before requesting proof of insurance. The record does not support this argument. Although the lack of sufficient liability insurance may not have been the primary dispute between the parties, the record reveals that it was a condition of the contract, was not waived, and was breached by Appellant. Therefore, the trial court was correct.
 {¶ 3} The relevant facts in this case are not particularly in dispute and are set out quite succinctly in the magistrate's decision. In November of 2000, Appellee *Page 3 
submitted its bid to the Ohio Department of Transportation to serve as the general contractor for the renovation of two bridges in Ashtabula County, Ohio. Appellee was awarded the contract. Appellant submitted the lowest estimate to Appellee to do the final painting work of the steel components of the bridges, and on January 29, 2001, Appellant was awarded the subcontract to paint the bridges for the amount of $129,112.00.
 {¶ 4} One of the conditions of the subcontract was that Appellant was to provide Appellee with certificates of liability insurance with limits of not less than $2 million per each occurrence. The exact wording of the insurance requirement is as follows:
 {¶ 5} "Prior to commencing work under this Agreement, the Subcontractor shall furnish to the Contractor Certificates of Insurance evidencing coverage written thru an insurance company licensed to transact business in the state where the work is located which meets the following:
 {¶ 6} "* * *
 {¶ 7} "The types and minimum requirements are as follows:
 {¶ 8} "a.) Commercial General and Umbrella Liability Insurance. Subcontractor shall maintain commercial general liability (CGL) and if necessary, commercial umbrella liability with a limit of not less than $2,000,000 each occurrence.
 {¶ 9} "* * * *Page 4 
 {¶ 10} "b.) Business Auto and Umbrella Liability Insurance. Subcontractor shall maintain business auto liability and, if necessary, commercial umbrella liability insurance with a limit of not less than $2,000,000 each accident. * * *" (Contract, p. 9.)
 {¶ 11} The contract also contains the following provision concerning the insurance certificate:
 {¶ 12} "Contractor shall have the right, but not the obligation, of prohibiting Subcontractor or any of their subcontractors from entering the project site until such certificates or other evidence that insurance has been placed in complete compliance with these requirements is received and approved by Contractor. Failure to maintain the requiredinsurance may result in termination of this contract byContractor." (Emphasis added.) (Contract, p. 10.)
 {¶ 13} In July, 2001, Appellee advised Appellant that the bridges were ready to be painted. Appellant began performing the preparation and painting work on August 1, 2001. As Appellant was preparing the steel to be painted, it found that there was an unusual amount of hardened concrete slurry on the surface of the steel, and that this was slowing down the painting process. The parties all agree that some concrete residue was expected to be found on the steel as a byproduct of the rehabilitation of the bridges. This residue occurs during the removal of the old concrete road surface of the bridge. The concrete is removed by cutting it with a powerful diamond-edged saw that is cooled with water, and the resulting concrete dust mixes with the water to form a slurry that drips down to the lower surfaces of the *Page 5 
bridge, including the steel framework of the bridge that will later be painted. The slurry normally dries into a powder or thin coating on the surface of the steel support structure underneath. In this particular case, though, there was apparently more dried slurry residue than usual.
 {¶ 14} Appellant worked at the bridge site until August 8, 2001, at which time the problem of the excess dried slurry was brought to Appellee's attention. Appellant stopped all work at the site on August 10, 2001, having completed approximately 30% of the work.
 {¶ 15} On August 13, 2001, Appellant sent Appellee a letter asking for an additional $24,600 to complete the contract. Appellant also stated that it needed an answer by the end of the day or else it would have to mobilize to a different job site and that there would be an extra charge when the crew returned to work on the two bridges.
 {¶ 16} On or about August 10, 2001, Appellee asked Appellant to produce a certificate of liability insurance in the amount of at least $2,000,000, as required by the contract. Appellee also requested a payment and performance bond for $129,112.00, a maintenance bond, a current workers compensation certificate, and two copies of Appellant's safety program.
 {¶ 17} Appellant removed at least some of its equipment on or about August 15, 2001. It is not clear from the record whether Appellant removed the equipment of its own volition, or whether it left in response to a verbal directive from Gerald ("Jerry") Bailey, Appellee's project manager. *Page 6 
 {¶ 18} Appellant could not obtain a $2,000,000 insurance certificate. Appellant's certificate of insurance listed a $1,000,000 limit, and Appellant was not able to obtain any more insurance coverage. The parties attempted to procure additional insurance for the next four weeks, but were unsuccessful.
 {¶ 19} On September 11, 2001, Appellee sent a letter to Appellant, which stated that: "We must have the correct documentation in our office no later than September 14, 2001 at 12:00 noon. If the proper documents are not received or complete in their presentation our only option is to cancel your subcontract and have the bridge painting completed by another painting contractor." Appellant did not submit the proper documentation by September 14, 2001.
 {¶ 20} On September 14, 2001, Appellee sent Appellant a letter cancelling the contract and asking Appellant to remove their equipment and debris by September 17th. Appellee did not pay Appellant for the amount of work that was done on the bridges before they left.
 {¶ 21} On June 12, 2002, Appellant filed a complaint for breach of contract and mechanic's lien. Appellant asserted that they were owed $39,360. On July 15, 2002, Appellee filed an answer and counterclaim. The counterclaim also alleged breach of contract and damages of $77,042.38 for the cost of completing the bridge painting project.
 {¶ 22} The case went to trial on November 17, 2004. The case was tried to a magistrate. The magistrate issued his decision on December 15, 2004, and ruled that Appellant did breach the contract by failing to provide proof of $2,000,000 in *Page 7 
insurance coverage. The magistrate found that Appellee did not raise the insurance issue until Appellant had completed 30% of the project. The magistrate determined that Appellee did not completely waive the enforcement of the insurance provision in the contract, but that Appellee could not use the insurance provision to avoid paying Appellant for the 30% of the project that was completed. The magistrate determined that Appellee sustained $55,190.62 in damages, and that this amount would be offset by $27,060.00, which was the value of Appellant's completed work, resulting in a total award to Appellee of $28,130.62. Although Appellee attempted to collect damages for additional charges incurred in cleaning the concrete slurry off of the steel framework of the bridges, the magistrate found that the removal of this excess slurry was Appellee's responsibility.
 {¶ 23} Both parties filed objections to the magistrate's decision. The trial court overruled all the objections, and affirmed the magistrate's decision on July 19, 2005, granting judgment in favor of Appellee in the amount of $28,130.62. This timely appeal followed.
 ASSIGNMENTS OF ERROR {¶ 24} "The $2,000,000.00 Liability Bond, the Insurance Certification and Safety Program Requirements Were Conditions Precedent to Fulfillment of the Contract Between the Parties Which it Intentionally and Knowingly Waived in Allowing Plaintiff/Appellants to Commence Work on the Job Site with Coverage of Only $1,000,000 Liability Bond. *Page 8 
 {¶ 25} "The Trial Court Erred, and O'HORO is Estopped From Seeking Recovery of Damages for its Substitute Contractor Expenses, Where the Evidence Establishes O'HORO's Waiver of such Terms, Palek's Substantial and Satisfactory Performance prior thereto, and that Palek Was, at All Times, Ready Willing and Able to Complete the Job Upon its Return."
 {¶ 26} The two assignments of error are related and will be treated together. The primary issue involves the $2,000,000 insurance requirement. The parties appear to agree that the contract term requiring Appellant to provide $2,000,000 in liability insurance coverage was material to the contract and that failure to provide the insurance would be considered a breach of contract unless it had been waived. Appellant's argument on appeal is that the trial court erred in finding that Appellee did not waive the insurance requirement as a condition precedent to the contract.
 {¶ 27} Ohio law generally provides that waiver is the voluntary relinquishment of a known right. State ex rel. Bd. of Cty. Commrs. v.Board of Dir. (1996), 75 Ohio St.3d 611, 616, 665 N.E.2d 202. Waiver is not to be lightly inferred, and the burden of proving waiver is on the party asserting it. Griffith v. Linton (1998), 130 Ohio App.3d 746, 751,721 N.E.2d 146, citing Harsco Corp. v. Crane Carrier Co. (1997),122 Ohio App.3d 406, 415, 701 N.E.2d 1040. "Whether or not there has been waiver of all or certain terms of a prior written agreement is a question of fact for the trier of fact." Vocke v. Third Nat. Bank Trust Co. (1971), 28 Ohio Misc. 58, 78, 267 N.E.2d 606; se alsoMark-It Place Foods, Inc. v. New Plan Excel Realty Trust,156 Ohio App.3d 65, 2004-Ohio-411, 804 N.E.2d 979, ¶ 58. The weight to be given the *Page 9 
evidence and the credibility of the witnesses are primarily for the trier of the fact to determine. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C. E. Morris Co. v. Foley Const.Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus.
 {¶ 28} Appellant argues that the insurance requirement was a condition precedent to the validity of the contract. "[A] condition precedent is one that is to be performed before the agreement becomes effective. It calls for the happening of some event, or the performance of some act, after the terms of the contract have been agreed on, before the contract shall be binding on the parties." Mumaw v. Western Southern Life Ins.Co. (1917), 97 Ohio St. 1, 11, 119 N.E. 132. The trial court did not specifically rule whether or not the insurance requirement was a condition precedent. The court did effectively rule that Appellee waived the insurance requirement for the initial work done by Appellant, but that this did not constitute a complete waiver. The trial court, without explicitly stating it, appears to have understood the contract as requiring continuing insurance coverage rather than simply initial proof of insurance. A closer look at the contract provides clear support for this interpretation. The contract contains a specific clause requiring continued insurance coverage: "Failure to maintain the required insurance may result in termination of this contract by Contractor." (Contract, p. 10.) *Page 10 
 {¶ 29} Although the magistrate's decision relies more on general principles of fairness and equity, the magistrate could have simply pointed to the requirement of continuing insurance coverage as the basis of the award to Appellee. Even if the trial court fails to mention each and every contract provision in support of its decision, a reviewing court is not authorized to reverse a lower court ruling merely because incomplete, or even erroneous, reasons were used to justify the trial court's decision. State ex rel. Carter v. Schotten (1994),70 Ohio St.3d 89, 92, 637 N.E.2d 306. The contract clearly supports the trial court judgment on the issue of liability insurance coverage.
 {¶ 30} Appellant also appears to argue that Appellee should be estopped, on vague grounds of equity, from enforcing the insurance requirement, but the equities do not weigh in Appellant's favor. Appellant would like this Court to strictly enforce an implied waiver against Appellee while at the same time overlooking the fact that Appellant unilaterally walked off the job on August 10, 2001. Within the first few days it worked on the bridges, Appellant informed the State of Ohio that it would not proceed any further on the project unless Appellee did something about the concrete slurry. (Tr., pp. 234-235.) Appellant then decided, on its own, to stop working on the site on August 10th. Appellant decided to stop working after it perceived that there would be extra work or expense involved in painting the bridge because of the slurry. Appellant also demanded an extra $24,600 from Appellee to finish the job. (Tr., p. 83.) This was after Appellee had already agreed to hire someone to clean off the excess concrete slurry. (Tr., p. 84.) In addition, Appellant requested a payment of *Page 11 
$10,000 from Appellee prior to the time that Appellee had expected to make this payment, and this request came after the controversy arose about the concrete slurry. The phone call concerning the $10,000 payment may have been the final catalyst that provoked both parties to strictly enforce the contract. (Tr., pp. 186ff.)
 {¶ 31} Although Appellant was the low bidder on the subcontract project, the record indicates that the person in charge of submitting the quote for the project, Nick Hazimihalis, never examined the specifications for the project before submitting the bid. (Tr., p. 253.) Mr. Hazimihalis testified that he simply relied on his 13 years of experience in coming up with the calculations for the bid. (Tr., p. 254.) Mr. Hazimihalis testified that he had performed ten similar subcontract bridge painting jobs prior to this one, and was aware of the entire process involved in bridge rehabilitation. (Tr., p. 249.) This apparently means that Appellant was aware that the concrete decking on the surface of the bridge is sawn into pieces and removed, that water is used to cool down the saw, and that the resulting watery concrete slurry drips down to the steel frame of the bridge below as part of the sawing process. Appellant submitted its bid based only on this general knowledge, and not on the specifications of the particular bridges at issue in this appeal. It is difficult to view these circumstances as favoring some type of further equitable relief in Appellant's favor, particularly when the trial court did compensate Appellant for the 30% of the work actually completed.
 {¶ 32} Based on all these considerations, the trial court correctly found that Appellee had not completely waived the insurance requirements in the contract. The *Page 12 
trial court made an allowance for the work that Appellant performed on the bridges, and awarded Appellee damages to cover the excess cost of completing the bridge painting project because of Appellant's breach. The record amply supports the trial court judgment, and we hereby affirm the judgment in full.
Vukovich, J., concurs.
 DeGenaro, P.J., concurs. *Page 1